FERDINAND W. TILDEN v. LORENZO STREETER.

*Bill to give a deed the effect of a mortgage— Weight of evidence.*

One who files a bill to have a deed given by him, construed as a mortgage, has the burden of proving beyond reasonable doubt that this was actually meant to be its effect.

A complainant seeking to have his deed construed as a mortgage is confined to the ground on which he filed his bill and cannot afterward claim that he was unduly influenced to execute the paper as a deed.

The fact of relationship between the parties to a bill filed to have a deed construed as a mortgage has no force except as it is pertinent to the case and will aid in proving or disproving it.

A bill to have a deed construed as a mortgage cannot be sustained unless there is convincing proof in complainant's favor, even though defendant's showing is such as to establish no claim on the confidence of the court.

Appeal from Wayne. Submitted Jan. 21. Decided April 13.

BILL to declare a deed to have been given as security. Defendant appeals. Reversed and bill dismissed.

*Julien Williams* and *William Jennison* for complainant.

*Robbins & Davis* and *Baldwin & Drapers* for defendant.

GRAVES, J. In approaching this contention it seems needful to refer at some length to certain historical data about which there is no room for controversy. It must be borne in mind however that there are many incidents of special significance more or less connected with these facts; but which, as being mere disputes or matters of dispute, are in such shape that no account can be given of them in their natural order without digressing into utter confusion. Their bearing and the color they lend to particular points and their ultimate effect can only be understood by a thorough study of the record. This intimation is needed to warn against hasty inferences and implications. By disregarding it and confining attention to a group of undisputed facts exhibited apart

from their surroundings and unattended by the conflicting explanations of parties and witnesses there would be great danger of forming most distorted and erroneous views of the actual case on which the court is compelled to adjudicate.

Prior to 1862 complainant's father and mother lived in the little hamlet of Waterford in Oakland county. The place, as may be inferred, contained less than two hundred inhabitants. The dwelling was a small cheap structure, designed to serve as a lean-to for a future upright, and the lot consisted of an acre of ground enclosed with a rail fence, and the whole premises were in a rude condition. The title was in the wife. Complainant's father went into the army and in 1862 lost his life. Complainant was the only child and was about six years of age. In 1866 his mother intermarried with defendant who was then nearly destitute of property. His business was that of carriage-maker, trimmer and painter. They made the premises referred to their place of abode. From this time forward during the life-time of complainant's mother the relations between the three appear to have been not merely pleasant, but affectionate. Complainant was well provided for by defendant and evidently treated with indulgence. He was kept at school and no further tasked apparently than was conducive to his own good. The prevalence of good feeling was reciprocal and constant, and the intercourse was very frank, the complainant manifesting no reserve in his conversation with defendant, nor anything like unpleasant subordination in his deportment. There is not a hint in the case of any approach towards ill feeling or disagreement or any jar in their association prior to this controversy. The correspondence in the record affords the strongest evidence of the closeness of their intimacy and the absence of all constraint in their mutual communication.

Sometime after the marriage, but the date is not explained, complainant's mother, in character of his guardian, received from the United States $649. But before this money was received the defendant commenced improving the little homestead; yet the greater portion of the improvements and indeed nearly all were made afterwards. In the course of a

few years a considerable amount in money and labor was expended. He smoothed the face of the lot, planted trees, made fence, erected a barn and outbuildings and added a two-story front to the house. In carrying on this improvement, however, the most of which was about 1870, he used a little over $400 of the money so received by Mrs. Streeter as the guardian of complainant. During these events complainant's maternal grandfather and grandmother lived near. A married aunt resided in the vicinity and two uncles in Detroit. One of the latter is the gentleman who now appears as complainant's solicitor. The other subsequently removed to Florida. The defendant had two married sisters in Waterford. A state of ill feeling existed between defendant and his mother-in-law, the grandmother of complainant, and complainant felt that his mother's relations were neither warm nor just and not entitled to his hearty love and respect. He was not inclined to confer with them freely and fully.

In August, 1878, his mother died intestate, leaving him her sole heir-at-law. The record contains intimations that there were some small parcels of real estate at or near Detroit, which fell to him in addition to his right at law, to the place at Waterford. A few days succeeding his mother's death, and about the 9th of September, 1878, complainant, who was then nearly 22 years of age, went to Detroit. It seems to have been his purpose to seek employment there if practicable. His uncle, the solicitor in this case, gave him some assistance. He likewise received aid from his grandmother and from the defendant. He soon entered a business college there and pursued a six months' course. During this time he corresponded with defendant, and complained that his uncle and grandmother were not disposed to give him much assistance, and were far from being warm and generous towards him. The other uncle, previously mentioned, owned a large tract of land in southern Florida, and was getting ready to remove there and settle, and complainant desired to go with him. But he lacked the necessary means, and neither of his relations tendered any, nor attempted to help him

obtain them. He wished to procure from $75 to $100, and expected on reaching Florida to get wages by laboring for his uncle, and imagined that he might in time succeed in getting a fruit farm for himself, and that possibly the defendant would finally join him. He suggested his desires and speculations to the latter, and spoke of one or two schemes for hiring the money. December 24th he went to Waterford, and visited defendant; and on the 27th the two went to Pontiac, and complainant there gave him a quit-claim deed of the homestead, and at the same time each executed a will in favor of the other. Complainant then returned to Detroit; but on the 7th of January, 1879, he again visited defendant, who at that time gave him $100. It was mutually understood that in consequence of the attitude of complainant's relatives and the desire expressed by complainant to escape their intermeddling and annoyance the existence of the deed should be kept from their knowledge until he should be away from them, and beyond their reach. Soon after the reception of the $100, his uncle was apprised of it, and was led to suppose it was an advance from defendant, and that the latter had nothing to show for it, and he instructed complainant that it was not proper to transact business in that way, and that he must give defendant his note for the money. With a view of keeping the real transaction from his uncle and his other relatives, he at once executed a note and gave his uncle to understand that he would forward it. He subsequently cut his name off and sent the note, thus mutilated, to defendant. He explained to the latter how the note came to be made, and that his purpose in forwarding it was that it might be represented that his uncle's directions had been complied with. He observed, that of course he would not have the money to pay it on its coming due, and if his uncle or his grandmother should wish to pay it, it would be all right, and he would be $100 better off. These explanations were made by letter after complainant had gone south, which was on the 15th of January, 1879. They kept up a frank and cordial correspondence until the summer of 1879.

June 30, 1879, defendant sold the Waterford property,

and received therefor $250 cash, a horse worth from $50 to $80, according to the testimony, and a house and lot in Detroit, said to be of the value of eight or nine hundred dollars, and on the 10th of August he married.   Complainant almost immediately returned to Detroit, and in September he filed this bill.   The case made by it, which was set forth under oath, cannot be misunderstood.   It is in substance that the transaction covering the deed and the furnishing the $100, was exclusively an advance of money by defendant to be repaid, and a giving of security therefor by complainant, and was not intended to be, and in fact was not a sale nor a conveyance of complainant's estate in the land.   In support of this claim, and for the purpose of accounting for the form and appearance given to the transaction, the complainant makes this sworn representation in the bill :

" Your orator further shows that in the month of December, 1878, that he was in poor and failing health, and had been for several months prior thereto ; that he became anxious to go to the State of Florida for the purpose of recovering the same, and to obtain employment there ; that the said defendant advised and encouraged him to go to Florida, and offered to furnish him money to defray his traveling expenses, on conditions hereinafter mentioned, as your orator had no means of his own ; that thereupon the said defendant stated to your orator, that if he would execute a conveyance of said premises to him he would advance to your orator the sum of $100 for the purpose aforesaid, and hold the same as security therefor : that said defendant further stated to your orator that if he executed said deed to him he would neither sell nor dispose of said premises ; that he would not record said deed until your orator had come into possession of other property, either by inheritance or otherwise, and that he only wanted said deed to secure himself for said advances in case of accident, or the death of your orator ; that he would never marry again, and that upon his death the property shold revert to your orator, and that he, said defendant, would make his will in your orator's favor for that purpose ; and your orator further shows that said defendant used every argument he could to induce your orator to execute said deed, and resorted to every means to excite your orator's sympathies.   Amongst other things he stated in the most affecting manner, with tears in his eyes,

that he was growing old ; that his working days were about over ; that he was your orator's dearest friend ; that your orator's other relations were unfriendly, and took no interest in your orator. Your orator further shows that the said defendant is now about the age of forty-two years.

"Your orator further shows that he was so filled with the idea of going south, and *being ignorant of the effect of executing such a paper as the defendant desired,* and relying entirely upon the honesty of said defendant, as well as the said representations so made, and believing that the said conveyance was merely to secure the payment of the said $100 until his return from Florida, agreed to do as he desired, and thereupon on the 27th of December, 1878, he executed and delivered to said defendant a *paper which he supposed was a mere security for said advance, but which he has since been informed and believes was an absolute conveyance of said premises,* as a reference to the record thereof, in the office of the register of deeds for said Oakland county will show when produced and proven," and "*your orator avers that he would not have executed such paper unless* he had supposed* it was a mere security for said advances, and that, as he *relied entirely* on his said stepfather's good faith and relations towards him, he took no advice or counsel *as to the nature* or effect of said paper."

The answer positively denies every material matter here stated except the fact of the giving of the deed and the payment of the $100, and proceeding to give his version the defendant explains substantially that in view of all the circumstances, including the furnishing of the $100, and considering how large a proportion of the existing value of the homestead was owing to defendant's means, labor and management, and considering how long and well he had provided for complainant and his mother, the complainant avowed his purpose to recognize the defendant's moral right by resolving it into legal interest through an absolute conveyance, and that he understandingly and freely gave the deed in execution of this purpose. The answer also sets up in substance that all the improvements were made by the defendant and without any extrinsic aid, and that it was expressly understood between himself and decedent that he should have a lien for his labor and expenditures.

The position of complainant not only as having the affirmative of the issue concerning the nature of the transaction between himself and the defendant, but also as insisting that the effect *prima facie* due to the deed is not the effect equitably due to it, subjects him to the burden of proof to show that the effect was actually intended to be as claimed. *Howland v. Blake* 97 U S. 624, 626 ; *Haines v. Thomson* 70 Penn. St. 434 ; 1 Jones on Mort. (2d ed.) § 326 and cases.

Without losing sight of this consideration it may be well to pause a moment at this point and see how far these claims must be regarded as palpably untenable.   In the first place it is clear enough that complainant's profession of being ignorant of the difference between a deed and mortgage is not worthy of belief.   It is not possible to read his correspondence without seeing that the statements in the bill on this subject have no foundation.   When he executed the deed he must have known its nature and mode of operation as contradistinguished from the nature and mode of operation of a mortgage.   Again, the proof in the case is ample to show that the representation made in the bill, of the state of his health and of the influence it had upon him to raise money to enable him to go to the South, is grossly exaggerated.   In respect to what was said between the parties in the course of their arrangement for the conveyance and the payment of the money, there is no evidence except their testimony, and their statements on the subject are fatally conflicting.   The representation by defendant that there was nothing in complainant's condition of health to stimulate his desire to go to Florida is too broad and is not warranted by the evidence.   There was just enough in his state of health to give somewhat more tone to the purpose which other considerations generated.

The claim that the improvements were all made by defendant or at his cost was not true.   He admitted on the stand that more than $400 which his wife held as guardian was thus applied.   Again, no proof has been offered to sustain the allegation that he was to have a lien for improvements. The result of this review is, therefore, that whilst the defend-

ant's explanations are materially impeached, the case set forth by complainant is in part disproved, and in what remains is very much weakened. The actual transaction is left without any other direct explanation than is furnished by the papers and the account given by Brown and others as to what occurred when they were made; and the complainant is necessarily compelled to rely on the acknowledged incidents and on such other circumstantial indications as the case affords. And one considerable difficulty is that several matters are of equivocal import, and may be as well accounted for on one theory as another. For example, the parties were evidently bent on misleading complainant's relatives in respect to the extent and true nature of their dealing, and their course and pretences in furtherance of this design may be as well credited to defendant's theory as to that of complainant.

In applying this jurisdiction it is needful to proceed with great circumspection. The natural and *prima facie* effect of a conveyance expressing no condition, and regularly executed in the presence of attesting witnesses and duly acknowledged as an absolute deed, ought not to be controlled and qualified by oral evidence, and brought down to the effect due to a mere security, on a slight showing. The great current of authority is distinct in holding that the party thus seeking to modify the operation of the instrument and prove himself entitled against the terms of his own deed to an equity of redemption is not only bound to make out that the transaction was in truth and justice nothing more·than the giving of security, but is required to do so by a force of evidence sufficient to command the unhesitating assent of every reasonable mind. Unless the testimony, say the Supreme Court of the United States, is entirely plain and convincing beyond reasonable controversy, the writing will be held to express correctly the intention of the parties. *Howland v. Blake*, supra. And many cases use much stronger language. *Bingham v. Thompson* 4 Nev. 224; *Zuver v. Lyons* 40 Iowa 510; *Schade v. Bessinger* 3 Neb. 140; *Stall v. City of Cincinnati* 16 Ohio St. 169; *Haynes v. Swann* 6 Heisk. 560; *Campbell v. Dearborn* 109 Mass. 130. A very full reference to the

authorities will be found in 1 Jones on Mortgages, ch. 8 (2d ed.).

Another point worthy of attention may be noticed here. The complainant is confined to the ground of action on which he has founded his case. He is not permitted to say now that he misstated the transaction and that he admits that he meant to convey the land fully and absolutely, but that the vice he wishes to complain of is that the defendant induced him thereto by undue influence. This would be in direct contradiction of the positive allegations of the bill and contrary to the scheme and equity of the case. The very gist of the bill is that the transaction was in truth *not a sale* nor an *absolute conveyance*, but an arrangement having no other end than the obtainment by complainant of $100 by way of loan and the giving of security therefor.

In dealing with the facts their applicability must be observed. They can have no force except as they are pertinent to the case made by the bill and are fitted to help prove or disprove it, and hence the relations of the parties, in so far as they have that tendency, are worthy of consideration. Beyond that they are of no importance now. The case must be examined and determined with reference to the principles which are appropriate to it, and not under a doctrine which is only germane to a claim of a different nature. The circumstance that defendant was complainant's stepfather—that they were close friends and mutual confidants—has been made conspicuous, and no doubt it is worthy of attention on this issue. Still the bearing of the fact is not exclusively applicable to the theory of complainant. So far as it has any aptness to influence the case at all, its character as well fits it to be pressed into the support of defendant's contention as into that of complainant. The argument is certainly admissible that it was a natural tendency of the relation to lead the complainant to espouse what was morally just and right towards the defendant, and that the existence of the relation is consequently entitled to weigh in favor of the construction that complainant's purpose was to make defendant the absolute owner of the little homestead, and not merely a mort-

gagee for the one item of $100 then or thereafter furnished. It is only necessary to read the correspondence to see that when the transaction took place the defendant held no ascendancy over complainant. The latter was about twenty-two years of age and was not destitute of self-sufficiency nor lacking of self-reliance. The glimpse afforded by the evidence of what occurred at the law office in Pontiac is pretty significant in its indication that he was very far from being the weak and passive victim of the stronger will, superior intelligence and overreaching craft and influence of the defendant. The case, however, creates an impression that there was some competition for his partiality. The defendant appears to have taken pains to fix and preserve his attachment and to strengthen his dislike of his mother's relatives, and they seem to have tried to dislodge his regard for defendant and induce him to side with them against the latter. The evidence that strong antipathies existed between defendant and his relations on the one side and the relatives of complainant on the other may be easily traced. It appears in some parts of the testimony which it undoubtedly colors. A careful scrutiny results in the opinion that neither complainant nor defendant has established any claim on the confidence of the court.

The evidence of admissions and declarations is conflicting and much of it comes from biased sources. Moreover, a portion of it, if not the most important, is equivocal. It would not disagree with the theory that the deed, while understood as a full transfer of ownership, and so meant, was intended to be concealed from complainant's relatives, who, as both parties desired, were to be misled in regard to what was actually done.

The cost to defendant for the improvements on the premises is a subject of dispute. The evidence is utterly conflicting, and it is also widely at variance in reference to the value of the place at the time of defendant's marriage. The difficulty encountered in dealing with these matters is greatly enhanced by the fact that there was an extreme fluctuation in prices. The special expense which complainant caused defendant is not explained. That there was considerable can

hardly be doubted, and there is ground for supposing that the actual outlay of defendant in expenses on the property for permanent objects, and in the support and assistance of complainant until he went south, may have been nearly if not quite equal to the cash value of the property in December, 1878. If such was the case there was a moral consideration sufficient to explain the transaction in harmony with the natural import of the deed. But whatever may be the truth in regard to this, it is sufficient that after rejecting whatever is not worthy of belief and judging as well as possible on the numerous contradictions, the matter available to make out the case and prove that the transaction was a giving of security is too slight and uncertain. It falls far short of what is required, according to the authorities, to authorize a court to decree that the intent the parties chose to manifest by their solemn deed is not the true one.

The decree should therefore be reversed and the bill be dismissed with the costs of both courts.

The other Justices concurred.