## CADMAN *v.* PETER.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE
WESTERN DISTRICT OF MICHIGAN.

Argued April 13, 14, 1886.—Decided April 26, 1886.

If a deed of land is in fee, with a covenant of warranty, and there is no defeasance, either in the conveyance or in a collateral paper, parol evidence that it was intended to secure a debt and to operate only as a mortgage, must be clear, unequivocal and convincing, or the presumption that the instrument is what it purports to be must prevail.

On the 25th of October, 1875, by a warranty deed, dated and acknowledged on that day, Charles C. Cadman and his wife, of Detroit, Michigan, conveyed to William Peter, of Toledo, Ohio, in fee, land in Newaygo county, Michigan, amounting to $8\frac{7}{16}$ sections, or 5400 acres, the consideration named in the deed being $20,000. On the same day, by a mortgage dated and acknowledged on that day, Peter mortgaged the same land to Cadman, to secure the payment to Cadman of $10,000 in four months, and $10,000 in six months, from that date, with interest at 8 per cent., according to four promissory notes of $5000 each, of that date, executed by Peter to Cadman. The deed and the mortgage were both of them recorded in October, 1875.

On the 1st of April, 1881, Cadman filed a bill in equity against Peter, in the Circuit Court of the United States for the Western District of Michigan, and an amended bill on the 23d of April, 1881. The latter contained the following allegations: About the year 1874 or 1875, Cadman became indebted to Peter in $10,000, for money borrowed, Peter making his two notes, for $5000 each, with interest at 7 per cent. per annum, payable to Cadman, to be by him endorsed, and used to obtain money for Cadman's benefit, which was done. The notes were renewed from time to time, Cadman paying up the accrued interest at each renewal, until October 25, 1875. On that day, Cadman owned the 5400 acres of land above mentioned, cov-

ered with pine timber and valued at upwards of $40,000, and was anxious to procure money, and applied to Peter to furnish him with $20,000 more, and the negotiations with Peter culminated in the following agreement : Peter agreed to loan to Cadman $20,000 more, by making two notes of $10,000 each. Cadman was to execute to Peter a deed of the land, as security for the entire $30,000. Peter was to hold the land until such time as it might be sold at a profit or for a greater sum than could be then realized, and, when such time should come, was to sell the land in the most advantageous manner possible, and out of the proceeds was to pay himself the $30,000, and interest thereon at the rate of 7 per cent. per annum, and the taxes which he should have paid on the land, and should divide the surplus, if any, paying over to Cadman one half, and retaining the other half to recompense himself for his labor, trouble and expense in selling the land. Cadman received and used the notes for $20,000, and the transaction was intended to operate as a security from Cadman to Peter for the repayment of the $30,000, and interest, and was so considered by both of the parties. At the time of the agreement and conveyance, the financial affairs of the country were greatly depressed, and land valuable chiefly for its standing pine timber was not in great demand, and both parties knew that an adequate price therefor could not then be obtained, but also knew that within a short time such land would greatly appreciate in value, and that, by continuing to hold the land until it should rise in value, they would be able to dispose of it at a price much beyond $30,000. Cadman had estimates of the timber standing on the land, and alleges that there was upwards of 40,000,000 feet at the time, worth not less than $60,000, and now worth, if none had been cut, from $80,000 to $120,000. During two years last past the property became valuable, and it could, at any time during the past eighteen months, have been readily sold for a sum sufficient to pay all of Cadman's indebtedness to Peter, and all moneys Peter may have expended for taxes. Cadman, on the —— day of ———, 1878, applied, by letter, from San Francisco, California, to Peter, for an accounting of his doings in the matter, and received

a reply that the land had not yet been sold, and consequently no account could be rendered. On the 4th of February, 1881, he again applied to Peter to settle the matter in some way, and Peter then ignored and repudiated the entire transaction, and stated to Cadman that he knew of no unsettled transaction between them, except an indebtedness of $10,000 from Cadman to Peter. Cadman thereafter offered to pay Peter $30,000 and interest, and any sums paid by Peter for taxes or other proper expenses, and requested Peter to release the security, and deed the land back to Cadman. Cadman offered to pay any sum that might be found due from him to Peter. The bill waived an answer on oath. It prayed for an accounting as to what was due from Cadman to Peter; and for a decree that the deed was an equitable mortgage, intended by the parties as a security for money loaned and expenses to be incurred about the land, and that Cadman be permitted to redeem the land on paying to Peter the money which should be found equitably due to him; and that then Peter might be directed to convey the land to Cadman. There was also a prayer for general relief.

The answer contained the following averments: Peter made the two notes for $5000 each, to the order of Cadman, to enable him to obtain money for his individual benefit, but at an earlier date than that stated in the bill. The land conveyed was not, at the time, valued at $40,000. There were no negotiations between Cadman and Peter which culminated in the agreement set forth in the bill, and Peter never made any such agreement. The deed was not received as security for money. At the time Peter received it, the affairs of the country were greatly depressed, and the land was valuable chiefly for the pine timber standing on it and was not in great demand, and an adequate price for it was difficult to be obtained, and this fact was known to both parties, and it was expected by both of them that it would appreciate in value, but that was a matter which should not affect Cadman, as he was in no way to have any interest in the land after the sale and the deed to Peter were made. The property had become valuable since Peter purchased it from Cadman, but he did not hold it to se-

cure any indebtedness from Cadman to him. Cadman did not, at any time in 1878, apply to Peter by letter for an accounting of his doings in the matter, and did not receive a reply that the land had not been sold and consequently no account could be rendered. On the 25th of October, 1875, Peter purchased the land from Cadman for $20,000, the price agreed on between them, and which was a fair price therefor at the time, and the sum had long since been paid. After the purchase, Cadman never claimed to have any interest in the land until a short time before the bill was filed.

The answer also contained a demurrer to the bill, as not stating a cause of action warranting the relief prayed.

Issue being joined, proofs were taken, and, on a hearing the bill was dismissed, in June, 1882. 12 Fed. Rep. 363.

*Mr. C. I. Walker* for appellant.

I. It is the settled law of Michigan, as well as of this court, that parol testimony is admissible to prove that a deed absolute is intended as a mortgage, and if so proved it may thus be treated. *Wadsworth* v. *Loranger*, Harr. Mich, 113; *Emerson* v. *Atwater*, 7 Mich. 12; *Tilden* v. *Streeter*, 45 Mich. 533; *Hurst* v. *Beaver*, 50 Mich. 612; *Ferris* v. *Wilcox*, 51 Mich. 105; *Russell* v. *Southard*, 12 How. 139; *Babcock* v. *Wyman*, 19 How. 289; *Villa* v. *Rodriguez*, 12 Wall. 323, 339; *Peugh* v. *Davis*, 96 U. S. 332; 1 Jones on Mortgages, § 285.

II. Undoubtedly in these cases the burden of proof is upon the party seeking to show a deed absolute to be a mortgage, and the testimony must be clear. *Howland* v. *Blake*, 97 U. S. 624; *Tilden* v. *Streeter*, 45 Mich. 533; 1 Jones on Mortgages, § 335.

III. If the evidence shows that the deed was in fact given as a security for a pre-existing debt, or for advances made or to be made, or for both, it is to be treated as a mortgage, irrespective of its form. Whether given as a security, to use the language of Judge Swayne, "is the very hinge of the controversy." *Russell* v. *Southard*, 12 How. 139, 148, 153; *Villa* v. *Rodriguez*, 12 Wall. 323, 336; *Peugh* v. *Davis*, 96 U. S. 332, 336; 2 Jones on Mortgages, § 1039.

IV. In determining this question whether a deed is to be construed as a mortgage, the adequacy of the consideration is an important element. *Russell* v. *Southard*, 12 How. 148, and cases cited; *Peugh* v. *Davis*, 96 U. S. 332.

V. So also are the confidential relations between grantor and grantee. *Babcock* v. *Wyman*, 19 How. 296–8.

VI. So also are the necessities of the borrower. *Russell* v. *Southard*, 12 How. 155.

VII. A promise to repay is not essential to constitute a deed a mortgage. *Russell* v. *Southard*, 12 How. 152, and cases above.

VIII. The fact that the grantee is to have the entire management of the property does not prevent a deed becoming a mortgage. *Babcock* v. *Wyman*, 19 How. 289, 294; *Emerson* v. *Atwater*, 7 Mich. 12.

IX. The cases cited by the district judge to sustain the decree, are cases where it was held that the deed was not intended as a security, and they are therefore not applicable. *Baker* v. *Thrasher*, 4 Denio, 493; *Macaulay* v. *Porter*, 71 N. Y. 171.

X. If the deed was intended as a security, the right to redeem attaches thereto, even if the grantor at the time agrees to release this right of redemption. 1 Jones on Mortgages, § 251; 2 Jones on Mortgages, § 1039.

*Mr. Ashley Pond* and *Mr. Harrison Geer* for appellee.

Mr. Justice Blatchford, after stating the case as above reported, delivered the opinion of the court.

The decision in the court below, 12 Fed. Rep. 363, announced these propositions: The agreement set forth in the bill is inconsistent with a right to redeem, it being stated as an agreement under which Peter was to hold the land until he should sell it, and then share in any profit from the sale. Under that agreement, even if it was valid, the deed cannot be turned into a mortgage, although the execution of the agreement, if valid, might be compelled, when the land could be sold at a considerable profit. If the agreement is obnoxious to the statute which declares that no trust concerning or in any manner relating to land shall be

created by parol, it cannot be enforced specifically nor employed to turn the deed into a mortgage. The agreement, if valid, would make Cadman a beneficiary under the deed, and create a trust in Peter concerning or relating to land, and, not being in writing and properly signed, is void under the statute of frauds.

But the grounds of the conclusion reached were stated thus: Under the evidence, Cadman is not entitled to relief, conceding the bill to state a good case.

1. The conveyance was absolute on its face, for an expressed consideration of $20,000. To overcome the effect of the deed, and turn it into a mortgage, the evidence must be clear and convincing, beyond reasonable controversy.

2. Peter gave back to Cadman a mortgage, of the same date as the deed, to secure the payment of the notes for $20,000 given for the purchase price. The mortgage was accepted and speaks for both parties, as a contemporaneous writing expressing their intention, and adding to the effect of the deed, as evidence that there was an absolute sale.

3. On January 21, 1876, Cadman wrote to Peter that he had drawn on the latter, at one day's sight, for $5000, to take up at a bank a note of $5000 made by Peter, due that day, which Cadman was unable to get extended by renewal. That note and another like it, due that day, were continuations of the $10,000 accommodation notes mentioned in the bill, which were in fact made in 1872. This $10,000 of paper is alleged by Cadman to have been secured by the deed. Peter had sent to Cadman two new notes to retire the two then coming due, and Cadman says, in his letter, that he had lodged one of the new notes as collateral to the draft. The draft, a copy of which is in the record, directs the amount to be charged to Cadman's account. Peter, on January 22, 1876, replied to Cadman thus: " I accepted your draft this morning. What do you think of making a draft on me at one day for $5000? I do not have the money to pay this draft. This shows for itself how my notes are peddled in Detroit. I have told you before that my credit will suffer from such transactions. You say you do this to save my good name. This is a most cruel assertion to me

under the circumstances, as I derive no benefit from it. Let me know at once if I must raise the money to pay this draft. I have $5000 to pay to your bank the same day. I want you to send me something to show that the two notes and this draft are for your benefit, and for you to pay it in case I should be taken away, which we are all liable to be. My estate should have something to show—in fact, I myself should have it." Peter would not have written thus, if the $10,000 of notes were for him to pay, and if, three months before, Cadman had given him security for the amount ; nor would he have asked Cadman to give what he had no right to ask from him. To the above letter Cadman replied, on January 24, 1876 : " I am sorely mortified and grieved that this should be the case, but I am entirely powerless to act. I think I can get the money on the other note in time to recall your acceptance. . . . I shall try and get the money, but if I do not, you can draw on me at three days' sight, and I will get the money in meantime on the note. I hardly know what to do. I will do anything in my power. I will send you my notes, or anything I have." Cadman would not have acquiesced in Peter's demand for something to show that Cadman was to pay the paper, and that it was all for his benefit, unless Cadman so understood the fact. On January 30, 1876, Cadman having come to the end, wrote to Peter thus : " I return your note, $5000, herein. I cannot use it, except to discredit you still more. I have resigned ; am a ruined man. . . . I owe so much money outside that I cannot stand the pressure. . . . My family have gone into the country to board, and I am ruined and penniless. I console myself, in your case, that the great bargain you made in the Newaygo lands will, in some great measure, compensate you for the loss you must incur, for I cannot take care of the acceptance due early in February." This was an acceptance by Cadman of a draft on him by Peter, drawn January 28, for $5000, at three days' sight, to pay the $5000 draft of Cadman at one day's sight, which Peter had accepted January 22. Peter having paid that draft, and there still being one $5000 note out against him, he would lose $10,000 by Cadman, having the land to represent the $20,000 of notes given for it,

which had not matured. This last letter cannot be reconciled with Cadman's version of the transaction as to the deed. At such a crisis in his affairs, with the transaction so recent, if he had a beneficial interest in the Newaygo lands, they being, as he now says, then worth $60,000, as against $30,000 of notes from Peter, he would not have dwelt on the great bargain Peter had made, as a matter of congratulation to Peter and consolation to himself, but would rather have taken consolation from the fact that he still had an interest in this valuable property. If the property, ample as Cadman now says it was, even at its value at that time, to secure to Peter the $30,000, was in fact merely a security to Peter for the $30,000, the idea of talking to Peter of loss was absurd. But if Peter owned the lands, had bought them at a bargain, and was likely to make by selling them a profit greater than $10,000, then the loss of the $10,000 by Cadman was properly called a loss to be compensated for out of a profit in selling the Newaygo lands for more than Peter had paid for them.

These are the considerations which induced the Circuit Court to dismiss the bill. They seem to us of controlling weight. It is not necessary to enlarge on them. The rule in cases of this kind is well settled. If the conveyance is in fee, with a covenant of warranty, and there is no defeasance, either in the conveyance or a collateral paper, parol evidence to show that it was intended to secure a debt, and to operate only as a mortgage, must be clear, unequivocal, and convincing, or the presumption that the instrument is what it purports to be must prevail. *Howland* v. *Blake*, 97 U. S. 624; *Coyle* v. *Davis*, 116 U. S. 108; *Case* v. *Peters*, 20 Mich. 298, 303; *Tilden* v. *Streeter*, 45 Mich. 533, 539, 540.

*Decree affirmed.*