[No. 1365.   Decided November 10, 1894.]

S.  W.  BARNES, *et al.*, *Appellants*, *v.*  S.  T.  PACKWOOD,
ET AL., *Respondents.*

AMENDMENT OF PLEADINGS—EVIDENCE—PAROL PROOF TO ES-
TABLISH MISTAKE IN WRITTEN INSTRUMENT.

The fact that the court allows defendants to amend their answer at
the trial, after three answers had already been filed in the case, does
not constitute an abuse of discretion on the part of the court.

Where it is sought to vary the terms of a written agreement on the
ground that through mutual mistake it fails to express the agreement
actually made, a mere preponderance of proof will not be sufficient,
but the evidence establishing the mutuality of the mistake must be
clear, unequivocal and convincing.

*Appeal from Superior Court, Kittitas County.*

*Ralph Kauffman*, for appellants.

*Pruyn & Ready*, for respondents.

The opinion of the court was delivered by

DUNBAR, C. J.—This is an action on a promissory note.
The note sued upon is as follows :

"$1500.00.          ELLENSBURG, WASH., Oct. 8, 1888.
One year after date, without grace, at 12 o'clock M., we
or either of us promise to pay to the order of Barnes & Mc-
Candless, for the use of the Agricultural Fair Association,
Fifteen hundred dollars U. S. Gold Coin, value received,
with interest from date at the rate of one per cent. per
month, interest payable when due, and if not so paid to be-
come a part of the principal and to bear like interest until
paid.    And further agreeing that if the same be not paid
when due and. suit be brought to collect the same or any
portion thereof, to pay ten per cent. on the amount due as
attorney's fee for collection.

S.  T.  PACKWOOD.
WALTER A. BULL.
J.  M.  SHELTON.
A.  B.  WHITSON.
THOMAS HALEY.
S.  R.  GEDDIS. "

The defendants answering the complaint alleged, that the note was signed in its present form through mistake; that the agreement and intention was that the note should be signed by the signers thereof as trustees of an association known as the Agricultural Fair Association; that they were not to be held individually responsible; that it was with this understanding that they signed it, and that it was the understanding of Barnes & McCandless, the plaintiffs, that it was so signed; that on the day the promissory note set out in the complaint was executed there was a meeting of the board of trustees of said corporation, at which meeting the defendants were present, and at said meeting a resolution was passed to borrow from said Barnes & McCandless, for and on behalf of said corporation, the said sum of $1500, and that the money was borrowed and the contract entered into in accordance with said agreement and resolution; alleging that the defendants received no benefit from said money; that it was turned over to said association, and that no consideration passed between the defendants and said Barnes & McCandless for said note.

The plaintiffs objected to any testimony being heard under this answer for the reason that it did not state facts sufficient to constitute a defense to the complaint. The court, however, overruled the objection and the case went to trial. Plaintiffs offered the note in evidence, proved its execution and rested their case. The defendants' testimony was in accordance with the allegations of the answer, so that the question arises here, was the testimony for the defense sufficient to overcome the presumption arising from the execution of the note, the execution of which was admitted. The case was tried by the court and a judgment rendered for costs for the defendants.

It was contended by the appellants that the court erred in allowing the defendants to amend their answer at the trial, and in not giving judgment for the plaintiffs on the pleadings, inasmuch as three answers had already been filed in the cause, and that it was a clear abuse of the court's discretion to permit the filing of the fourth; that even that

was insufficient as it contains no allegation of a mutual mistake and such an allegation is necessary.

We think the answer substantially contains the allegation of mutual mistake, although not in so many words ; and the court having such a large discretion under our law and practice in matters of amendments, we do not think we would be justified in reversing the case for this reason. There is no allegation of fraud in the answer.

The general rule laid down by the text writers is that parol evidence is not admissible to contradict, qualify, extend or vary written instruments, but that their interpretation must depend upon their own terms. But to relieve parties from the distress of accident or mistake or fraud, courts of equity will admit parol evidence to qualify and correct and necessarilly sometimes to even defeat the terms of written instruments.

"One of the most common classes of cases," says Mr. Story in his Equity Jurisprudence, Vol. 1, § 152, " in which relief is sought in equity on account of a mistake of facts is that of written agreements either executory or executed. Sometimes by mistake the written agreement contains less than the parties intended, sometimes it contains more, and sometimes it simply varies from their intent by expressing something different in substance from the truth of that intent. In all such cases if the mistake is clearly made out by proofs entirely satisfactory, equity will reform the contract so as to make it conformable to the precise intent of the parties. But if the proofs are doubtful and unsatisfactory, and the mistake is not made entirely plain, equity will withhold relief, upon the ground that the written paper ought to be treated as a full and correct expression of the intent until the contrary is established beyond a reasonable controversy."

It would certainly be a dangerous doctrine to announce that the terms of a written instrument should be varied and its effect changed or destroyed by any slight testimony, or mere preponderance of testimony. The very object of reducing agreements to writing is to prevent trouble arising from the defects of memory. All the agreements which have been talked about by the parties leading

up to the final agreement are presumed to be merged in the writing, and the object of this precaution would be destroyed and it would have a tendency to encourage perjury, if upon slight testimony the sacredness of the written instrument could be destroyed. And such is almost the uniform holding of the courts.

In *Townshend v. Stangroom*, 6 Ves. 339, Lord Eldon says that those producing evidence of a mistake undertake a case of great difficulty, and that the evidence must be irrefragable. In *Sable v. Maloney*, 48 Wis. 331 (4 N. W. 479), the court held that a written instrument would not be reformed on the ground of alleged mistake unless the party complaining move promptly after the discovery of the mistake, and not then without clear proof. Said the court:

" ' If the proofs are doubtful and unsatisfactory, and the mistake is not made entirely plain, equity will withhold relief, upon the ground that the written paper ought to be treated as the full and correct expression of the intent unless the contrary is established beyond reasonable controversy.' The parties to the deed, who appear to be equally credible, are in direct conflict, and there was no other direct evidence nor any surrounding circumstances in corroboration of the testimony of the grantor of the deed."

So in the case at bar. The testimony of the defendants and the plaintiffs is in direct conflict. It matters not that there are four defendants and two plaintiffs. Even the burden of proof does not depend upon the number of witnesses who testify on the respective sides of the case. It was held in *Mead v. Westchester Fire Ins. Co.*, 64 N. Y. 453, that to justify the court in changing language of the written instrument sought to be reformed (except in case of fraud), it must be established that both parties agreed to something different from what is expressed in the writing, and the proof upon this point should be so clear and convincing as to leave no room for doubt.

In *Stiles v. Willis, Admr.*, 66 Md. 552 (8 Atl. 353), it was held that where application is made to a court of equity to have a mortgage deed reformed, by having a personal covenant inserted therein, as to one of the parties, alleged to

have been omitted by mistake of the draftsman, the proof must be of such a character as to leave no doubt whatever in the mind of the court that mistake has intervened, and that the instrument is variant from the actual contract of the parties ; that it is not enough to show the intention of one of the parties to the instrument only, but the proof must be established incontrovertibly that the error in the instrument alleged was common to both parties. In other words, it must be conclusively established that both parties understood the contract as it is alleged it ought to have been expressed, and as in fact it was, but for the mistake alleged in reducing it to writing.

This case is on a dead level with the case at bar, and, with the other cases above quoted, seems to us to go to the extent of holding that the mistake must be established beyond a reasonable doubt.

In *Stockbridge Iron Co. v. Hudson Iron Co.*, 102 Mass. 45, the court said :

"By the common law, parties who execute written instruments are bound by them, and parol evidence is not admissible to add to or diminish or vary their terms. The rule is of great practical importance for the protection of the interests of the citizen, and it is the more so since parties and interested witnesses are permitted to testify. The writing must be regarded, *prima facie*, as a solemn and deliberate admission of both parties as to what the terms of the contract actually were," citing *Babcock v. Smith*, 22 Pick. 61, where the court held that "the power of rectifying and reforming solemn written contracts is one which by courts of general chancery jurisdiction is exercised very sparingly, and only upon the clearest and most satisfactory proof of the intention of the parties."

And it is also asserted in *Stockbridge Iron Co. v. Hudson Iron Co.*, *supra*, that

"The ordinary rule of evidence in civil actions, that a fact must be proved by a preponderance of evidence, does not apply to such a case as this. The proof that both parties intended to have the precise agreement set forth inserted in the deed, and omitted to do so by mistake, must be made beyond a reasonable doubt."

The logic of the cases cited, even where it is not so specifically expressed, is that the proof of a mistake must be beyond a reasonable doubt. But we might still go beyond the question of mere preponderance and yet not go to the extent of requiring the proof beyond a reasonable doubt. That a mere preponderance of the testimony will not be sufficient to overcome the presumption that the parties have expressed their agreement in the contract, has been decided by this court in *Voorhies v. Hennessy*, 7 Wash. 243 (34 Pac. 931). In that case there was an attempt to prove by parol evidence that an absolute bill of sale was given as a chattel mortgage; and the court, in speaking of the testimony in that case, says:

"In such cases the solemnity of a writing is not to be overcome by a mere preponderance of evidence. The writing itself stands as the clearly stated and deliberately ascertained intention of the parties, which must be enforced, unless it is shown by clear, positive and convincing evidence that the mutual intention was something else, and that it was with such different intention understood by both parties that the instrument was delivered and accepted. This is the rule in equity, where cases of this kind are most frequently heard; and when submitted to a jury the same rule applies."

The rule is laid down in Jones on Mortgages, § 335, that one who alleges that his deed in absolute form was intended as a mortgage only, is required to make strict proof of the fact; that the proof must be clear, unequivocal and convincing; that the fact that the grantor understood the transaction to be a mortgage is not alone sufficient to prove it to be so, but if the evidence is doubtful and unsatisfactory, if it fails to overcome the strong presumption arising from the terms of the absolute deed by testimony entirely clear and convincing beyond reasonable controversy, the deed must have effect in accordance with its terms; that the unsupported testimony of the plaintiff, contradicted by the defendant, is insufficient to convert an absolute deed into a mortgage. Here it will be observed that it is the unsupported testimony of the defendants, contradicting that of

the plaintiffs, which is relied upon to relieve the defendants from the obligation imposed by the written instrument.

In *Purington v. Akhurst*, 74 Ill. 490, it was decided that where a bill of sale is made of vessels for one-half interest therein, it will require evidence of the clearest character to show that it was intended only as a mortgage to secure a loan or advances. To the same effect is *Sewell v. Price's Adm'r*, 32 Ala. 97.

"To show by parol that a deed absolute in form is a mortgage the evidence must be clear and convincing."—*McCormick v. Herndon*, 67 Wis. 648 (31 N. W. 303).

"The rule in cases of this kind," said the court in *Cadman v. Peter*, 118 U. S. 73 (6 Sup. Ct. 957) "is well settled. If the conveyance is in fee, with a covenant of warranty, and there is no defeasance, either in the conveyance or a collateral paper, parol evidence to show that it was intended to secure a debt, and to operate only as a mortgage, must be clear, unequivocal, and convincing, or the presumption that the instrument is what it purports to be must prevail."

See, also, *Howland v. Blake*, 97 U. S. 624. *Coyle v. Davis*, 116 U. S. 108 (6 Sup. Ct. 314); *Tilden v. Streeter*, 45 Mich. 533 (8 N. W. 502).

If a mere preponderance of the testimony were all that was required to destroy the force of a written instrument, there would be very little use in reducing an agreement to writing; for the preponderance of testimony is required in any case to establish the affirmative propositions asserted. So that it must be seen that if any effect at all is given to a written instrument the rule of mere preponderance cannot attach.

In this case it had been several years from the time the note was given until the action was tried, and the testimony of the defendants satifies us that their recollection of events which transpired at the meeting testified of could not be very definite or certain. Neither is the testimony of the defendants entirely harmonious. It is testified by the defendants that a resolution was passed by the board of trustees authorizing the borrowing of the money in question

from Barnes & McCandless; that the trustees were called together for that purpose, and at the instance of Barnes, who was present when the resolution was passed. This resolution is not even brought to bear in this case, but depends also upon the memories of the witnesses, for the records of the society had been burned between the time of the alleged passage of the resolution and the bringing of the action. One of the witnesses testified in relation to the matter that they all went down to the office of Barnes & McCandless and signed the note. Others are not certain where the note was signed, but think probably it was there, and are not able to remember who was present at the time of the signing. They all say that it was the understanding that they were not to be held liable as individuals but as trustees, but the utterances which brought about the understanding are dragged out of the witnesses by direct and leading questions. Referring to the testimony of Walter A. Bull, for instance, when asked whether there was any talk about individual liability:

"Answer. I think there was.

Question. What was said about that?

A. We wouldn't sign only for the corporation.

Q. What did Barnes say about that?

A. All right.

Q. How much money do you remember was to be loaned?

A. $1500.

Q. You have heard the note in controversy there read?

A. Yes.

Q. Did you sign this note?

A. Yes.

Q. How did you come to sign this note?

A. I signed the note for the association.

Q. Was this note given in pursuance of the arrangement had there with Mr. Barnes?

A. Yes.

Q. Now, who drew up this note?

A. I don't know.

Q. Where did you sign the note?

A. I think it was in Mr. Barnes' office.

Q. When you signed it whom did you intend to bind?

A.   The Fair Association.
Q.   Anybody else?
A.   No.
Q.   Did you intend to bind yourself?
A.   No.
Q.   Did you get any part of this money?
A.   No.
Q.   Any benefit directly or indirectly from it?
A.   No.
Q.   What was done with the money?
A.   I don't know.   I think it was used for the Fair Association."

So that it seems that the memory of the witness is so faulty about the transaction that he is not even certain what use the money was put to, for which he made himself responsible, and it is not sufficient that his intention was at the time he signed the note that he should not be bound individually; but to escape the responsibility of the individual note which he signed, under the plea of a mistake, it must not only plainly appear that it was his intention that he should not be bound, but it must as plainly appear that it was the intention of Barnes & McCandless.

During the testimony given by Thomas Haley the following questions were answered:

"Q.   Do you remember any resolution being passed there?
A.   Yes.
Q.   Do you remember who drew it up?
A.   I don't remember who drew it up.   I don't remember who was secretary.
Q.   Now, what else occurred there at that meeting? Was there any agreement made between the president and Mr. Barnes?
A.   Yes, sir.
Q.   State what that agreement was?
A.   Mr. Barnes was to loan the association money, if the board of trustees would sign the note.
Q.   Sign the note how?
A.   As an association.
Q.   Was anything said about personal liability?
A.   No, sir.
Q.   Was there any talk there about the members of the board not wanting to be personally liable?

A. There was talk about the members saying they wouldn't be personally liable.

The testimony contradicts itself, for if there was nothing said about personal liability there could not have been anything said about the members of the board being personally liable. The witness testifies, however, that Mr. Barnes was to loan the association money if the board of trustees would sign the note as an association. So it stands to reason, if this question of personal responsibility had been called to the minds of the defendants at that time, and they had refused to sign individually, but had especially agreed to sign as trustees, that they would have carried that agreement out by signing as trustees instead of signing as individuals. The following excerpt is taken from the testimony of A. B. Whitson :

"Q. You can state how you know this meeting was called for the purpose of passing this resolution. (Objected to.)

Q. Did you hear Mr. Barnes talk about this matter ?

A. No, sir.

Q. Did he say anything at the meeting about it ?

A. I don't remember what he said at this meeting. It was discussed at this meeting.

Q. He was present at it ?

A. Yes.

Q. Now what was said there in his presence about why the resolution had to be passed ? (Objected to ; sustained.)

Q. Now state what transpired at this meeting.

A. We passed this resolution that we would borrow this money of Barnes & McCandless.

Q. What were the contents of that resolution ; do you remember?

A. I don't remember its contents exactly.

Q. What was the substance of it ?

A. Well, the resolution was passed that we should borrow the money from him.

Q. Do you know who prepared that resolution?

A. The secretary.

Q. Now, was there any agreement entered into there between the trustees for the corporation and Mr. Barnes?

A. There was.

Q.   State what that agreement was.   State what Mr Barnes did.

A.   I don't know what Mr. Barnes said, but it was mutually understood.   (Objected to "mutually understood.")

THE COURT:   You can state what the effect was of what was said.   State in substance.

A.   There was a mutual understanding that we were to sign this note and get the money from Mr. Barnes.

Q.   How were you to sign it?

A.   Sign it as trustees of the association."

So it will be seen from this testimony that the witness instead of stating the facts from which a conclusion could be drawn by the jury or by the court, simply stated the conclusions, thereby making himself a judge of what state of facts would warrant Barnes in coming to the conclusion that he should look to the trustees instead of the individuals who signed the note.

(Continuing)   "Q.   Was there anything said there about the individual liability of the trustees?

A.   Yes, sir.

Q.   What was said?

A.   I remember it was spoken of whether we would be individually liable in this or not.

Q.   Was that spoken of by the trustees?

A.   It was, in open meeting.

Q.   Was Mr. Barnes there?

A.   Yes.

Q.   Did Mr. Barnes say anything in answer to that?

A.   I don't remember as he did."

In answer to the question, "How did you come to sign this note sued upon here as individuals?" the answer was:

"A.   I didn't sign it as an individual.   I signed it as a trustee, is my understanding.

Q.   Did anyone advise you that this was the way to bind a corporation and make a statement to that effect?   (Objected to; overruled.)

A.   I don't know as I had any advice on the subject.

Q.   Who drew up this note?

A.   I don't know."

So that, so far as Whitson's testimony is concerned, it is simply conclusive of what his understanding was at the

time the note was signed, without proving or tending to prove in any way the understanding of the plaintiffs.

The testimony of McCandless, on the other hand, is to the effect that he was present at the time of the drawing up and signing of the promissory note in suit. He testifies that the president of the association came to the plaintiffs to know if they would loan the association some money, and the plaintiffs told him they would not loan it a dollar. "He then said, 'will you loan it to us individually?' I told him we would, and he went in and came back and we drew up a note, and he took it and had it signed."

" Q. When you say you would loan it to them individually, to what individuals did you refer?
A. Well, during the conversation he mentioned the individuals who would sign the note, if we would let them have the money,—Mr. Packwood, Mr. Bull, Mr. Haley, Mr. Whitson, Mr. Geddis and himself, and we told him we would loan those gentlemen the money.
Q. · And you told him you would not loan the association a dollar?
A. Yes, sir; that we would not loan it a dollar."

This testimony is objected to by the respondents on the alleged ground that it does not refer to the same transaction. The witness states that it was on the same day, the day prior to the signing of this note, that this conversation occurred, and it is certainly as near the transaction as is the testimony of the defendants; for according to their testimony the resolution and agreement spoken of here was made from one to three days before the signing of the note. The positive testimony of Mr. Barnes is that when asked by the president of the association to loan said association money, he told him that he would not loan the Fair Association anything at all:

"'That we would not loan it a dollar. But then he said he could get an individual note and named over certain parties he thought would sign the note, and asked if he could get the money if those parties would go on the note," (mentioning the names of the parties who now appear on the note). " I told him while we were all there together, if he would get a note signed by those parties individually

we would let him have the money.    I made out the note myself and he took it and afterwards brought it back with those names on there.

Q.   Did you pay out the money on the note?
A.   I did.''

The witness also testified that he knew of the financial condition of the association; that there was a mortgage on its property for $2500, and knew that it would not be a safe investment to loan it money.    This witness testifies, beside, that the note was not signed in his office at all, but that it was delivered to the president of the society who obtained the signatures.

It can be readily gathered from the testimony of the witnesses for the defense that they are not certain where the note was signed.    Some of them testify that they thought it was signed in the office of Barnes & McCandless.    In fact, there is a mist of uncertainty hanging over their testimony in regard to the whole transaction; just such uncertainty as might be expected where men are relying upon their memories concerning the transaction of several years before, uncertainties which it is the special office of a written agreement to avoid.

There is another circumstance in this case which strengthens the theory of appellants, and that is that certain signers of this note, some years afterwards, when they were pressed for payment, individually agreed each one to pay the one-fourth of this note.    This agreement is testified to by Kauffman, a disinterested witness, and is a pertinent circumstance in the case.

Again, the form of the note itself indicates that the understanding was as testified to by Barnes.    If these parties had intended to sign a note binding the corporation only, they would have signed it as they did, adding after their names, "Trustees of the Agricultural Fair Association."    Such a signing as this would simply have been held to have been descriptive of the names of the signers, and would probably not have bound the association ; but it would have indicated the intention of the parties to bind the association, and would have been such a signing as the ordinary citizen, not ac-

quainted with technical law, would have executed. But here the note not only is not signed, "The Agricultural Fair Association, by Packwood *et al.*," nor "Packwood *et al.*, for the Agricultural Fair Association," nor "Packwood *et al.*, Trustees of the Agricultural Fair Association," but is signed in such a manner that it indicates that there was no attempt or thought of binding the association in any way. It is true that there occurs in the note this language, "For the use of the Agricultural Fair Association." This is explained by the testimony of Barnes that they told him they wanted that inserted so that it would show where the money went, as the money was actually for the use of the Fair Association, and assisted them in keeping their books with the said association. It is also no doubt true that the resolution was passed authorizing these trustees to borrow money for the association. In fact, it is not likely that they would have borrowed it under any circumstances had not such a resolution been passed and the will of the Association been thereby expressed. But in our judgment that was all the effect that the resolution had, and from that resolution the trustees felt warranted in borrowing money for the use of the association, and made themselves personally liable for the same, looking to the society for their pay and relying upon the resolution as authority for borrowing the money.

It is true that there are four witnesses who testify here in favor of the contention of the respondents and only two in favor of that of the appellants. But this, as we have said before, can go no further than a preponderance of the testimony, conceding the witnesses to be all of equal credibility. We think there are no cases sustaining the doctrine that the presumption that a written instrument expresses the true agreement of the parties can be overcome by a mere preponderance of the testimony.

The judgment will be reversed and the cause remanded with instructions to give judgment to the plaintiffs for the amount asked for in the complaint.

SCOTT, ANDERS, STILES and HOYT, JJ., concur.