LEO AUSTRIAN & COMPANY (A CORPORATION) v. NATHAN SPRINGER.

94    343
142   s 10

94    343
f158  634

*Sale—Contract—Authority of agent—Custom—Evidence—Damages.*

1. The procurement by a traveling agent of an order for goods, signed by the orderer, in which the prices and date of shipment are specified, supplemented by a paper signed by the agent and delivered to the orderer, acknowledging the ordering of the goods, describing them, and giving prices and time of shipment the same as in the order, creates a contract for the sale of the goods.

2. Parties dealing with an agent have a right to presume that his agency is general; citing *Methuen Co. v. Hayes*, 33 Me. 169; *Trainer v. Morison*, 78 Id. 160.

3. The presumption is that one known to be an agent is acting within the scope of his authority; citing *Inglish v. Ayer*, 79 Mich. 516.

4. Evidence of persons who have dealt with the principal through the agent is competent to show the character of the agency; citing *Heffron v. Armsby*, 61 Mich. 505; *Haughton v. Maurer*, 55 Id. 323; *Gallinger v. Traffic Co.*, 67 Wis. 529.

5. The authority of the agent must depend, so far as it involves the rights of innocent third persons who have relied thereon, upon the character bestowed, rather than the instructions given; citing 1 Amer. Lead. Cas. 567, 568; *Griggs v. Selden*, 58 Vt. 561; *Insurance Co. v. Pierce*, 75 Ill. 426; *Packet Co. v. Parker*, 59 Id. 23; *Inglish v. Ayer*, 79 Mich. 516.

6. Whatever attributes properly belong to the character bestowed upon an agent will be presumed to exist, and they cannot be cut off by private instructions of which those who deal with the agent are ignorant; and among those attributes is the power to do all that is usual and necessary to accomplish the object for which the agency was created; citing Mechem, Ag. § 347; *Tobacco Co. v. Jenison*, 48 Mich. 459, 462.

7. Agents sent out by manufacturers to solicit orders are held out to the trade as having authority to act according to the general usage, practice, and course of business conducted by such manufacturers through such agents; and the question of what is usual or necessary to be done by such agents is ordinarily for the jury.

8. A general custom, so well settled and notorious as to raise the presumption that it was known to buyer and seller, cannot be rebutted by the testimony of the seller that he was not aware of its existence; distinguishing *Pennell v. Transportation Co.*, 94 Mich. 247, where the custom sought to be shown was confined to a particular locality.

9. The general rule is that the measure of damages for the breach of a contract to sell and deliver personal property, when the purchase price has not been paid, is the difference between the contract price and the market price at the time and place of the promised delivery; citing *Haskell v. Hunter*, 23 Mich. 305; 2 Suth. Dam. 365.

10. A question calling for the name of an association, to which the witness has referred in a letter written by him, does not necessarily call for the contents of a written instrument.

Error to Kent. (Adsit, J.) Argued November 16, 1892. Decided December 23, 1892.

*Assumpsit.* Defendant brings error. Affirmed. The facts are stated in the opinion.

*John T. Miller* and *Taggart, Wolcott & Ganson,* for appellant, contended:

1. There was no evidence of defendant's knowledge of the alleged custom, and, in the absence of such proof, the jury should have been instructed that it was their duty to find that he did not know of it; citing *Byles v. Township of Golden,* 52 Mich. 612.

2. We fail to find any authority to sustain the proposition which is involved in the charge given, viz., that, after one party to a contract receives notification from the other party that the latter is unable to perform the contract, he may wait six weeks after the date fixed as the limit for delivery before making any effort to procure the goods in question elsewhere, thereby increasing the loss to some 10 or 12 times its original amount, and then throw the entire loss upon the other party. Such, we respectfully submit, is not the law; citing *Chadwick v. Butler,* 28 Mich. 349; 2 Suth. Dam. 365-375.

3. The rule of law is that in an executory contract for the sale of personal property, if the vendor refuses to deliver, the vendee is entitled to recover as damages the difference between the contract price and the market value of the goods at the time and place appointed for delivery, and interest; citing 2 Suth. Dam. 365; Benj. Sales, § 870; *Chadwick v. Butler,* 28 Mich. 349.

*Stuart & Knappen,* for plaintiff, contended for the doctrine of the opinion.

McGRATH, C. J. Plaintiff is engaged in manufacturing furniture at Chicago, Ill., and defendant is a manufacturer of looking-glass plates at Fuerth, Bavaria. On the 21st of March, 1890, one Frank O. Fitton called at plaintiff's office; gave to plaintiff's manager a card as agent of defendant; "said he came to sell me German looking-glass plates for importation; that he was selling for defend-

ant,—and quoted prices;" and after some negotiations plaintiff signed a written order drawn up by Fitton, which is as follows:

"[Letter heading of Leo Austrian & Co.]
                    "CHICAGO, March 21, 1890.
"NATHAN SPRINGER, Fuerth, Bavaria.

"*Dear Sir:* Please enter our order for following German looking-glass plates; same to be shipped as soon as possible,—not later than May 15,—and f. o. b. Chicago; freight to be prepaid to New York, and duty and freight from New York to be paid by consignee, and deducted from invoice. [List given.] Terms and discount: 60—10 —2½ on plain; 60—10—5—2½ on beveled. The size 10½ by 17, beveled, being quoted at net 37½ cents, f. o. b. Chicago. Net 60 and 90 days.
                    "LEO AUSTRIAN & CO."

Fitton drew up, signed, and delivered to plaintiff, the following:

"[Letter head of Leo Austrian & Co.]
                    "CHICAGO, March 21, 1890.
"Ordered from Nathan Springer, Fuerth, Bavaria, following German mirrors, to be shipped soon as possible,— not later than May 15. Terms, f. o. b. Chicago. Net 60 and 90 days. [List of glass, prices, terms, and discounts, same as in order signed by plaintiff.]
                    "FRANK O. FITTON, Agent."

Fitton said he would accept the order. The discounts were from list prices. Plaintiff had a price list, on which Fitton gave the discounts.

The defendant did not deliver the goods. About May 1, 1890, plaintiff received from defendant the following letter:

"[Letter head of N. Springer.]
                    "FUERTH, BAVARIA, April 15, 1890.
"Mess. LEO AUSTRIAN & CO.,
                    "Chicago, Ill.

"*Gentlemen:* Your valued order March 21 duly to hand, and regret not to be able to execute it in the time specified. Hoping to hear from you later, I remain,
                    "Truly yours,
                    "N. SPRINGER."

Leo Austrian says:

"Upon receipt of that letter, I wrote to defendant. I suppose my letter was sent out of the office as all the mail is. The letter copy book was accidentally destroyed. Up to the 1st day of July, I expected that the order would be filled. On June 28, 1890, I placed an order in New York. They would give me no price at the time, but the order was placed subject to July prices."

This suit is brought to recover the difference between the prices named in the order given to Fitton and the prices paid. Plaintiff recovered, and defendant appeals.

The first question raised is that the evidence fails to show a contract between the parties:

1. The order signed by plaintiff and the paper signed by Fitton do not constitute a contract.
2. It does not appear in evidence that Fitton had authority to make a binding contract.

These two propositions practically resolve themselves into one; for, if Fitton had authority to bind defendant, the procurement and receipt of the order was sufficient, in itself, to create a contract. *Kessler v. Smith*, 42 Minn. 494 (44 N. W. Rep. 794). In that case the order was solicited at St. Paul, Minn., by one of the firm, and was addressed to the firm at New York. In *Heffron v. Armsby*, 61 Mich. 505, a memorandum of sale was signed by the soliciting agent only, and delivered to the purchaser. It was held that, if the agent was authorized to act for the vendor, the memorandum was sufficient to satisfy the statute of frauds.

In addition to the receipt of the order by the agent in the present case, the agent executed an acknowledgment, "Ordered from Nathan Springer," etc., and signed it, "Frank O. Fitton, Agent." This cannot be treated as a mere receipt for an order, nor is it an acknowledgment of a request to enter an order, but rather an acknowledg-

ment of the entry of the order, signed by Fitton as agent for his principal.

As to the authority of the agent, there is no evidence of any limitation upon his powers. It appears that he was the agent of defendant. He was in defendant's employ, and sent out for the express purpose of taking orders for glass. He was a resident of the United States, and was employed by letter. He held himself out as an agent, and that to defendant's knowledge. In his correspondence with his principal, he wrote upon a letter head in which his name appeared as "manufacturer's agent." The only question that can be raised under this record is as to the extent of his authority. Parties dealing with an agent have a right to presume that his agency is general, and not limited (*Methuen Co. v. Hayes,* 33 Me. 169; *Trainer v. Morison,* 78 Id. 160); and the presumption is that one known to be an agent is acting within the scope of his authority (*Inglish v. Ayer,* 79 Mich. 516). Plaintiff went further. Evidence of persons who had dealt with defendant through this agent was introduced to show the character of his agency. This was competent. *Heffron v. Armsby, supra; Haughton v. Maurer,* 55 Mich. 323; *Gallinger v. Traffic Co.,* 67 Wis. 529 (30 N. W. Rep. 790). One Sielkin testified that he had known defendant since January, 1889; that for three years the firm of which he was a member had been buying glass from defendant,—a part of that time through Fitton; that orders had been given by his firm, through Fitton, in September, 1889, and February, 1890. In December, 1889, witness received an invoice from defendant of the September order, on the heading of which was printed the words, "Agents are not authorized to collect or receive money on my account." The witness says, further:

"Mr. Fitton solicited, in person, the order which I

handed to him personally, and the order mailed to him was solicited by him, in person. During the same time we purchased goods direct from the defendant, Springer. The defendant mailed us two price lists, and Mr. Fitton has at divers times made quotations verbally to us. I have other bills showing sales from Springer to H. Lieber & Co., either verbally or through correspondence, but am unable to fix any dates as to when such orders were given."

One Pugh testified that he had acted as agent for defendant, Nathan Springer; that on the 15th day of May, 1890, he became the partner of Warren C. Dewey, who was at that time the agent at Grand Rapids for the defendant, for the sale of his products; that the agency ended on the 1st of July, 1890, by reason of Nathan Springer's entering into a pool, in consequence of which he could not sell to parties outside of the combination.

"We were authorized to take orders for the defendant for German looking-glass plates. We were in the habit of accepting orders without submitting them to the defendant, except in cases where a new account was opened, when the name was referred by us to the financial agent at New York of the defendant, for the purpose of ascertaining the financial standing of such new customer, in such cases, where the standing of such new customer was doubtful. The defendant knew of this habit, and filled orders that were sent to him. We were apprised of the prices at which we were authorized to make sales either by cablegram or by letter. I do not know Frank O. Fitton. I do not know whether he was an agent of the defendant, but I know he was reputed to be, and was generally acknowledged to be such an agent, among the trade."

It is well settled that the authority of the agent must depend, so far as it involves the rights of innocent third persons who have relied thereon, upon the character bestowed, rather than the instructions given. In other words, the principal is bound to third persons, acting in ignorance of any limitations, by the apparent authority given, and not by the express authority. Mechem, Ag. § 283.

The question is not, what was the authority actually given?
but, what was the plaintiff, in dealing with the agent,
justified in believing the authority to be? 1 Amer. Lead.
Cas. 567, 568; *Griggs v. Selden*, 58 Vt. 561 (5 Atl. Rep.
504); *Insurance Co. v. Pierce*, 75 Ill. 426; *Packet Co. v.
Parker*, 59 Id. 23; *Inglish v. Ayer*, 79 Mich. 516.   What-
ever attributes properly belong to the character bestowed
will be presumed to exist, and they cannot be cut off by
private instructions of which those who deal with the agent
are ignorant.   Among those attributes is the power to do
all that is usual and necessary to accomplish the object for
which the agency was created.   Mechem, Ag. § 347;
*Banner Tobacco Co. v. Jenison*, 48 Mich 459, 462.   Parties
sent out by manufacturers to solicit orders are held out to
the trade as having authority to act according to the
general usage, practice, and course of business conducted
by such manufacturers through such agents; and the
question of what is usual or necessary to be done
by such agents is ordinarily for the jury.   In the present
case the principal was removed thousands of miles from
the customer, at a point where, in the ordinary course of
mail, it would take from four to six weeks to exchange
letters.   We find no error in the instructions given upon
the point discussed.

The second and third assignments of error relate to
the admission of testimony tending to show a custom in
selling glass to furniture manufacturers—First, as to the
means of making such sales; and, second, as to the accept-
ance of orders by agents making the sales.   The evidence
was objected to, unless coupled with a proposal to bring
home to the defendant knowledge of such custom.   One
of the witnesses had resided in Grand Rapids; was then a
resident of Chicago; had, while at Grand Rapids, acted as
agent for defendant; and, while such agent, had habitually

accepted orders without conference with defendant, and to his knowledge. Another witness was a resident of Chicago, but had been connected with a firm of manufacturers and importers of looking-glass, having their place of business in New York, and their factories at Fuerth, Bavaria. Another was a salesman, engaged in Illinois and Wisconsin, selling mirrors as agent for foreign manufacturers. Another witness was a member, at Indianapolis, of a firm dealing in mirror glass, and had been connected with the firm for 22 years. For 3 years the firm had been buying mirror plates from defendant, and several orders had been given through Fitton, as agent for defendant. This evidence tended to show that the custom was not a purely local one, but one that prevailed generally. The rule is that the custom must be one so well settled and notorious as to raise the presumption that it was known to buyer and seller. Mechem, Ag. § 348. This presumption was not, therefore, rebutted by defendant's testimony that he was not aware of such custom, although it might have been, had the custom been shown to have been a purely local one. This was shown to be a general custom pertaining to the glass trade in this country, and not confined to any particular locality, as was the case in *Pennell v. Transportation Co., ante,* 247.

Upon the question of damages, it is insisted that immediately after the receipt of defendant's letter, or in the early part of May, the advance in the price of glass was but light, and that plaintiff should have at that time supplied itself, but, instead of so doing, it waited until the latter part of June, at which time the advance was much greater. The general rule is that the measure of damages for a breach of contract to sell and deliver personal property, when the purchase price has not been paid, is the difference between the contract price and the market price at the time and place of the promised delivery.

*Haskell v. Hunter,* 23 Mich. 305; 2 Suth. Dam. 365. The goods were to be delivered at Chicago, and were to be shipped not later than May 15. In the ordinary course it would take from 30 days to 2 months for them to arrive at Chicago. The times of payment fixed by the contract were net 60 and 90 days after delivery at Chicago. Leo Austrian testified that he placed a number of orders during the month of June, but that the parties refused to ship the goods. There was abundant testimony tending to show that dealers declined and evaded contracts or shipments during that month, in expectation of an advance in prices. He says:

"I tried to make larger purchases in June. I tried to buy of Mr. Hart and Mr. Gloeckler, and I went myself to New York, personally, to buy. I could not get glass. They gave me prices all right, but, when I inquired for such sizes as I needed in my business, they uniformly said: 'We have not got them now. Wait a few weeks, and we will give them to you.'"

Referring to certain New York houses, he says, further:

"I believe those were the only four houses in New York that I had any dealings with, and I tried to buy glass of them at that time. I made an effort to buy glass, and they uniformly told me that they had none for sale just now; to wait a few days, and I could have all the glass I wanted."

He placed an order on June 28, but it was taken subject to the July advance. One of defendant's witnesses testifies that he gave an order to defendant in the latter part of May, and it was declined.

It was held in *Goodrich v. Hubbard,* 51 Mich. 62, 70, that, the plaintiff not having elected to consider the contract broken before the arrival of the time for its full performance, he was entitled to the difference in value as of that time. See, also, *Schmertz v. Dwyer,* 53 Penn. St. 335; *Kribs v. Jones,* 44 Md. 398. The court instructed the jury

that plaintiff was entitled to wait a reasonable time for the goods to reach Chicago, after the final date of shipment, and in this we think there was no error. It is very evident from this record that there was, in fact, no market price for mirror glass during any time in the month of June, and under the testimony the goods could not have reached plaintiff before some time in that month.

The testimony of defendant's manager was taken by deposition. He testified that he wrote the letter to plaintiff dated April 15, 1890, and that the defendant did not have the manufacturing capacity to fill the order at that time, and undertook to give additional reasons why the order had not been filled, viz., that the order included a size not contained in the list, and that he was unwilling to give plaintiff credit to the amount of the order. On cross-examination the witness testified that they had refused to ship an order given by the Kent Furniture Company of Grand Rapids, dated May 24, 1890, taken by one Dewey; that on the 20th of May, 1890, they cabled Dewey to take no more orders; that he had a brother to whom he wrote, asking him to effect a settlement by which the moneys owing from the Grand Rapids Furniture Company to the defendant, held back by reason of damages claimed for failure to fill orders, might be paid over; that the contract with the association is dated June 30, 1890,—therefore, it could have nothing to do with the rejection of these orders.

"*Q.* What is the name of that association referred to in that letter?

"*A.* I may have referred in my letter to a contract which Mr. Springer had subsequently made, on the 30th of June, 1890, with the German Looking-Glass Company, of New York.

"*Q.* For what period of years did the contract referred to in that letter run?

"*A.* From its date, the 30th of June, 1890, to the 31st of December, 1892.

94 MICH.—23.

"*Q.* In that letter, did you not state, in substance, to your brother, that you were satisfied the defendant had made a mistake in going into that contract with the association referred to, and that you and defendant desired now to make such arrangements with the Grand Rapids furniture trade as to be able to regain their patronage when the term of years for which defendant was under contract not to sell to American houses should expire?

"*A.* Yes, I may have said something of that kind. I keep no copy of my private letters."

These questions were objected to, but the objections were overruled, and we think properly. This was cross-examination, and the testimony tended to show reasons for the failure to fill the order other than those given. The jury were instructed that the testimony was admitted for that purpose only.

A witness who had written a letter in which he had referred to an "association" was asked to name the association referred to. The question did not necessarily call for the contents of a written instrument.

The testimony called for in the question put to the witness Creque, and excluded, was substantially given by the witness.

Evidence admitted without objection tended to prove the assertions made by counsel for plaintiff in his opening.

The rules laid down dispose of the other questions raised.

The judgment is affirmed.

The other Justices concurred.