## WASEY v. WHITCOMB.

1. SALES — CHATTEL MORTGAGES — DISTINCTIONS — DEBTOR AND CREDITOR.

   Where a retail dealer in pianos, being unable to secure the consignment to him of certain lines of instruments, contracted with defendant to advance the price to the manufacturers, receive the pianos as the owner, and consign them to the dealer as agent to sell on commission, accepting a receipt for them as the property of the purchaser, who was also to be the owner of piano contracts secured by the dealer and agent in disposing of the instruments at retail, the commissions to be all that the agent could obtain above advancements and interest, and where the dealings of the parties were consistent with the theory that the dealer was not the owner, although none of the manufacturers who sold pianos to him knew of the arrangement, and where the contract provided that the dealer should report all sales to defendant, should bear all expenses of collections, and insurance, and should deliver all unsold pianos so held on thirty days' notice to the defendant, the transaction did not amount to a chattel mortgage of the merchandise, but created a sale to defendant.

2. SAME—EVIDENCE—PAROL TESTIMONY.

   Parol testimony of contemporaneous and previous conversations between defendant and the piano dealer, relating to the purpose and intent of such arrangement, is competent to explain and illustrate the meaning of the written contract.

3. SAME.

   The defendant, being the owner of all pianos consigned under the agreement with the retail dealer, was the owner of any contracts of sale and was entitled to have them stand until 'the purchaser paid, so as to obtain interest on his advances: nor could the dealer require defendant to sell contracts to him on the payment of the amount advanced.

4. SAME—PRINCIPAL AND AGENT.

   An agent to sell may not sell to himself.

5. SAME—CONSIGNMENT—WORDS AND PHRASES.

   To consign, in mercantile terms, is, ordinarily, to send or transfer goods to a merchant or factor for sale, and such consignment creates an agency, title remaining in the consignor.

6. SAME.

Nor was the fact that commissions of the retail dealer were not based on a percentage conclusive, since commissions are not always or usually on that basis, and by special agreement may be otherwise determined.

7. SAME—FACTOR—BROKER.

Commission merchants being entitled to sell in their own name, the fact that sales were made in the name of the dealer, and the defendant was not treated as owner of the pianos, did not change the relation.

8. SAME—INTEREST.

Since interest may be a recompense for the use of anything that has an ascertained pecuniary value, as well as money, the agreement to pay defendant interest on money advanced did not alter the agreed relations between the parties.

9. SAME—DEL CREDERE—AGENCY.

By agreeing to be liable for the contract price of a piano sold, if the purchaser should fail to keep up his payments, the consignee created an ordinary *del credere* agency.

10. SAME—INSURANCE.

Nor did the proviso that the agent should carry insurance for the benefit of the owner affect the status of the title: to carry insurance is one of the ordinary duties of the factor or commission merchant.

11. SAME—EVIDENCE—CONTRACTS—CONSTRUCTION.

In determining whether a contract is in fact a chattel mortgage, it is competent to consider the circumstances under which it was made as well as the practical construction given to it by the dealings of the parties.

12. SAME.

A vendor who alleges that his absolute bill of sale was intended only as a mortgage must make strict proof thereof.

13. SAME.

The essential characteristics of a mortgage are that there is a debt, legal liability, or obligation actually existing at the time of its execution, or contemplated at such time and afterwards actually incurred, and intention to secure that debt or obligation by some form of conveyance or agreement.

14. SAME.

And although in some instances contracts had been made to sell on installment to customers certain pianos in the commission merchant's hands from other consignors, and defend-

ant took over the contracts so held, paying the consignors the amount due them on the purchase price, he became the absolute owner of such contracts.

15. SAME.

In other instances where defendant accepted consignment receipts from the dealer as if for the purchase of new pianos, when in fact the dealer had previously bought them and practiced a deception on defendant by treating them as new purchases, defendant acquired title to the pianos.

16. SAME—BANKRUPTCY—RECOUPMENT.

In a suit by the trustee in bankruptcy of the piano dealer against defendant for an accounting for the bankrupt's interest in piano contracts held by defendant, money appropriated wrongfully out of the proceeds of piano contracts from collections made on them by the bankrupt should be credited on any amounts due to the bankrupt estate for commissions.

17. SAME.

The trustee in bankruptcy has no other or greater rights than the bankrupt would have had.

Appeal from Wayne; Erskine, J., presiding. Submitted April 12, 1911. (Docket No. 70.) Decided October 2, 1911.

Bill by Edward G. Wasey, trustee in bankruptcy of James Vaughan, against Edgar B. Whitcomb for an accounting and other relief. From a decree dismissing the bill of complaint, complainant appeals. Affirmed.

*Graves & Hatch,* for complainant.

*Herbert C. Munro* and *Jasper C. Gates* (*William L. Carpenter,* of counsel), for defendant.

STONE, J. We compile the following from the statement of facts in this case, made by complainant's solicitors. The bill of complaint is exhibited by the complainant in his capacity as trustee in bankruptcy of the estate of James Vaughan against the defendant. The purpose of the bill, as claimed by complainant, is twofold: *First,* to procure an accounting from the defendant for certain

complicated business transactions between himself and the bankrupt, and thus secure certain money and property to which the bankrupt's estate is equitably entitled; and, *secondly,* to avoid certain conveyances made by the bankrupt to the defendant in the same business transaction, on the ground that they were, in substance and effect, conveyances intended to operate as chattel mortgages, and, never having been filed for record, were void as to creditors represented by complainant.

For a number of years prior to June 24, 1902, James Vaughan had been a retail dealer in pianos and other musical instruments in Detroit, having a storeroom and warehouse on Woodward avenue, in that city, where he kept a stock of goods and conducted the business in his own name. In the course of his business, Mr. Vaughan bought pianos and other musical instruments from the manufacturers thereof in his own name, sometimes for cash, and sometimes upon credit, and he also had on hand a quantity of pianos which certain manufacturers had consigned to him, to be sold for them upon commission. In the course of his business, Mr. Vaughan frequently sold the pianos and other musical instruments under written contracts of so-called conditional sale, whereby the purchaser agreed to buy the piano from Mr. Vaughan and pay for the same in installments, but Mr. Vaughan permitted the purchaser to have possession of the piano so long as the latter was not in default; Mr. Vaughan retaining the title to the piano until the same was fully paid for. These contracts of conditional sale are in this litigation termed "piano contracts." Mr. Vaughan had also in some instances, where he sold the pianos on commission, made contracts in the name of the manufacturer, retaining title in the manufacturer, as above indicated. In some instances, prior to June 24, {1902, Mr. Vaughan, after securing piano contracts in his own name, as above stated, was accustomed to sell the same to the defendant; the defendant paying therefor the face of the contracts, less an agreed discount; and Mr. Vaughan

assigning the contracts, sometimes by a separate assignment, and sometimes by a written indorsement thereon, signed by him, and delivering the contracts to the defendant.

On June 24, 1902, a new arrangement was made between Mr. Vaughan and the defendant, which new arrangement was evidenced by the following instruments (Exhibits B and C), attached to the bill of complaint:

## "Exhibit B.

"Memorandum of agreement made this 24th of June, 1902, between Edgar B. Whitcomb of the city of Detroit, Mich., hereinafter known as the party of the first part, and James Vaughan of the same place, hereinafter known as the party of the second part. Whereby the party of the first part agrees to consign for sale and the party of the second part agrees to accept on consignment for sale, pianos, organs and other musical goods, at the price and on the terms and conditions hereinafter agreed upon.

"*First.* All expenses incurred in selling said consigned instrument to be paid by the party of the second part.

"*Second.* All sales to be reported promptly and cash sales to be settled for at the time of settlement of sale.

"*Third.* All sales made on installments to be made on lien notes or contract forms drawn in the name of the party of the second part.

"*Fourth.* All contracts or lien notes accepted in settlement of sales to be indorsed by the party of the second part to the party of the first part until the amount due for the instrument it represents is settled for in full with interest, as provided at 6 per cent. from date of sale or after four months from receipt of instrument.

"*Fifth.* The amount of recompense or commission due party of the second part shall be the amount for which said instrument is sold in excess of the cost of said instrument, as represented by a consignment receipt given by the party of the second part to the party of the first part at the time of acceptance of said instrument on consignment bearing the name and number of said instrument, which receipt forms a part of this contract.

"*Sixth.* In case any instrument or other property shall be taken in exchange in part payment of any piano or musical instrument represented in this agreement, said

instrument or property shall be taken as recompense or commission by party of the second part, and in case the amount allowed for same shall be in excess of the amount due the party of the second part, then party of the second part agrees to pay party of the first part any excess in cash or acceptable contracts.

"*Seventh.* Party of the second part agrees to repossess any instrument sold under the agreement whenever deemed necessary, and to resell the same free of expense to the party of the first part, for an amount equal to the balance of the principal and interest remaining due on said instrument or in default replace the same or any deficiency with cash or acceptable contract.

"*Eighth.* Party of the second part agrees to make all collections free of expense to party of the first part and report same whenever requested to do so, and in case of undue neglect or default in making said collections said party of the second part agrees to allow party of the first part any expense incurred in making said collections.

"*Ninth.* Party of the second part agrees to make report of all stock on hand or in prospective customers' hands whenever requested to do so.

"*Tenth.* Party of the second part agrees to carry at his expense.sufficient insurance against fire to cover cost of instruments in stock at all times, for the protection and benefit of the party of the first part.

"*Eleventh.* Party of the second part agrees to surrender to the party of the first part or his authorized agent, on thirty days' notice, all unsold instruments, held on consignment under terms of this agreement, and to deliver same to any address he may designate in the city of Detroit free of expense to the party of the first part.

"*Twelfth.* All contracts or lien notes taken under this agreement by the party of the second part are guaranteed by the party of the second part and in case of unreasonable default on the part of any purchaser, the instrument represented shall be repossessed and resold by the party of the second part free of expense to the party of the first part, for a sum equal to the amount remaining due to party of the first part, with accrued interest thereon; in default the same shall be paid in cash or other acceptable contracts.

"EDGAR B. WHITCOMB.
"JAMES VAUGHAN."

"Exhibit C.

"DETROIT, Sept. 30, 1902.
"Received of E. B. Whitcomb one piano and_____
as per list below, of the value of $_____, said instru-
ment to be sold for said E. B. Whitcomb, and the sum of
$_____to be paid therefor, with interest at the rate of
\_\_\_\_per cent. per annum after four months from above
date, or if sold before four months said interest to be from
date of sale.

"Said instrument is to remain the property of said E.
B. Whitcomb, and any contracts given for the sale of
same to be the property of said E. B. Whitcomb, until
this amount is paid in full.
                [Signed]        "JAMES VAUGHAN."

At this time Mr. Vaughan had on hand some pianos
which he had purchased of various manufacturers, and
also certain pianos which had been consigned to him by
the manufacturers thereof. From and after June 24,
1902, Mr. Vaughan and defendant did a large business
with each other pursuant to this new arrangement, and
Mr. Vaughan bought a large number of pianos and other
musical instruments from the various manufacturers
thereof upon credit; and the defendant in each case ad-
vanced a sum of money equal to and intended by the
parties to cover the purchase price of some particular
piano or musical instrument already purchased by Mr.
Vaughan, and the latter, in each case, at the time of the
advancement or shortly after, executed and delivered the
consignment receipt, a form of which is given in Exhibit
C. Mr. Vaughan proceeded to make sales of the numer-
ous pianos covered by these consignment receipts (in most
cases the sale being made in the form of piano contracts)
to his various customers, and he proceeded to the collec-
tion of the amounts due upon these piano contracts. Mr.
Vaughan was permitted to retain the first moneys col-
lected upon each piano contract, instead of paying the
same over to the defendant, so that actually in most cases,
if not in all cases, Mr. Vaughan, instead of the defendant,

secured the first money collected from each piano contract.

In most cases Mr. Vaughan purchased the pianos and musical instruments in his own name, and in no case delivered actual possession thereof to the defendant, but retained possession thereof until sold by him to his customers; and the sales were in all instances made in the name of Mr. Vaughan. The piano contracts were made in his name as were the collections. Neither the agreement of June 24th, nor any of the consignment receipts, were ever filed for record in the office of the clerk of the city of Detroit, pursuant to section 9523, 3 Comp Laws. Mr. Vaughan kept a book called the "Piano Register," in which he entered, under the name of the manufacturer, the name and number of each piano purchased, and the cost price. In this book he entered, in red ink, the letter "W" before the name of each piano in which defendant was interested, at or about the time defendant advanced money thereon. He also kept two accounts on his books with defendant, one styled "E. B. Whitcomb Stock Account," and one styled "E. B. Whitcomb Contract." In the former account he credited defendant with all money received from defendant, and charged defendant with each particular piano, by number and price, which came under the contract. In the latter account he credited defendant with all money collected on contracts which defendant owned absolutely and charged him with all money paid him.

At regular intervals after June 24, 1902, Mr. Vaughan rendered a statement of the pianos and contracts on hand, and the amounts collected, and these statements were used by the parties for the purpose of striking a balance in their accounts. In these statements defendant was always credited with interest on the money advanced by him, evidenced by consignment receipts.

Shortly before October 18, 1904, defendant, for the first time, became aware of the fact that Mr. Vaughan was in-

solvent, and defendant, on the latter date, procured from Mr. Vaughan a bill of sale of all of the stock of pianos and other corporeal personal property used in the business, wherever located, belonging in whole or in part to, or owned by, Mr. Vaughan, and all the accounts receivable upon contract and incorporeal personal property arising out of the business to the extent of Mr. Vaughan's interest therein. This bill of sale was placed upon record as a chattel mortgage. Another paper was simultaneously executed by Mr. Vaughan and defendant, reciting the fact that defendant had advanced money to Mr. Vaughan for the purpose of purchasing certain pianos, and had taken title to the same in his own name, and that Mr. Vaughan had sold the pianos and failed to account to the defendant therefor, and had also, as agent of defendant, collected money on piano contracts held by defendant and failed to account for the same, and that the consideration for said bill of sale was the indebtedness aforesaid. This latter agreement was not recorded. Defendant immediately took possession of all of the property covered by the bill of sale. A few days later Mr. Vaughan executed to defendant an assignment in writing of all of the piano contracts, including those on the June list.

Upon October 27, 1904, a petition was filed in the district court of the United States for the eastern district of Michigan, southern division, in bankruptcy, by certain creditors of Mr. Vaughan, to have him adjudicated a bankrupt, with the result that, on November 7, 1904, Mr. Vaughan was adjudicated a bankrupt, and on November 29, 1904, the complainant was duly appointed trustee in bankruptcy for Mr. Vaughan; and, having qualified as such, upon November 30, 1904, has ever since continued to act as such trustee in bankruptcy, and filed the bill of complaint in the present case on May 18, 1907.

All the property covered by the bill of sale, and not covered by the consignment receipts, was surrendered to the complainant. Whatever name may be given to Mr. Vaughan's interest in the pianos and piano contracts cov-

ered by the consignment receipts, whether equities, as complainant contends, or commissions, as defendant contends, it is the claim of complainant such interest was covered by the bill of sale of October 18, 1904.

There is some criticism by defendant of complainant's statement of facts, but what is in litigation here ought not to be much in question, in view of the announcement made by one of complainant's solicitors, while taking testimony in this case. That statement was as follows:

"*Mr. Graves:* We are making no claim against Mr. Whitcomb by virtue of this bill of complaint for any money or property, except money, or except pianos or piano contracts, for which consignment receipts were given to him by Mr. Vaughan in the manner that has been disclosed here in this case so far."

To show what the circuit judge considered as the question in issue in this case, we quote the following language from his written opinion:

"The complainant contends that the contract of June 24, 1902, and the consignment receipts and the business dealings between the parties operated as a chattel mortgage on the pianos to secure advancements made by the defendant to Vaughan, and the performance by the latter of his agreement to sell the pianos and repay to the defendant the amount of the advancement, with interest, and that these instruments, not being filed in the office of the city clerk, and certain creditors of Vaughan having in the interval extended credits or renewed their indebtedness they were entitled to attack the transaction as fraudulent. Defendant, on the other hand, contends that the title to the pianos actually vested in the defendant, and that the instruments were not intended, and did not operate, as chattel mortgages. Passing by the serious question raised by defendant as to the right of the complainant to maintain the bill, it is my conclusion that it was the intention of the parties that the title to the pianos and the piano contracts in question should be in Whitcomb. This is borne out by their subsequent transactions, practically construing the relations between them. This being so, and it appearing that defendant has turned over to the trustee the property covered by the bill of sale,

not affected by the consignment receipts, I conclude that complainant is not entitled to further relief."

And the decree dismissing the bill proceeds upon the same theory. The complainant has appealed.

From a statement of the case made by one of defendant's counsel, it is said that the defendant received possession of these contracts from the bankrupt for whom complainant is trustee, and appropriated the same to his own use, under the claim that he was the owner of them, and that the trustee brings this suit to obtain their value, claiming: (a) That defendant's only title to the property was an unrecorded chattel mortgage, void as against the creditors represented by him; and (b) that, even if defendant owned the contracts, Vaughan had an equity therein, for which defendant must account.

It is clear to us that the first question for us to determine is whether the defendant's interest or title was that of an owner or mortgagee. There is no doubt, from the record, that, under the course of business under the contract and consignment receipts, Mr. Vaughan was permitted to use the first money paid on the piano contracts to reimburse himself, but it is important to note that he went beyond this, and appropriated to his own use $7,698.03 of the money belonging to defendant. The details of this misappropriated money are shown by certain exhibits in the record. So that, had Mr. Vaughan paid over the money that was due to the defendant, there would have been some equity due to Mr. Vaughan growing out of the contracts. But the evidence is undisputed, not only that Mr. Vaughan had collected and retained all that would ever have been his, had he fully performed his whole contract as to these pianos, but that he collected and appropriated the above-named sum which belonged to the defendant, and which he had failed to turn over. There is one more item which may as well be noted in this connection. In the record one of complainant's solicitors stated as follows:

"Mr. Whitcomb did turn over to Mr. Wasey every-

thing, except that which Mr. Whitcomb claimed to own by virtue of having these consignment receipts, except that one Fischer piano. We left that out altogether."

This, we understand, is the piano, the value of which ($130.50) defendant, pending suit, paid into court. This brings us to the consideration of the contract and consignment receipts.

1. It will be observed that the written contract between the parties proceeds upon the assumption that the title to the pianos is in defendant. Just how this title was to become defendant's is not stated in writing, but that subject was covered by an oral agreement made before the writing was signed, which we think it proper to consider in this connection. Mr. Whitcomb testified as follows:

"He [Vaughan] said there were some pianos that he could not buy; some manufacturers who manufactured very good and cheap pianos, but they did not sell them on consignment, and he would like to get some. He could not pay for them in cash, and he wanted to know if I would not take the place of the manufacturer, and buy these pianos and consign them to him, as others were doing at the time."

Upon cross-examination of Mr. Vaughan, who was a witness for complainant, this occurred:

"*Q.* Isn't it a fact, Mr. Vaughan, that right at the time [June, 1902] when you made that agreement that it was stated between you and Mr. Whitcomb both ways, that Mr. Whitcomb should come in and take the place of the manufacturer, and have the manufacturer's rights, so far as you were concerned, and, among other things, get the $15 charged by the manufacturers for credit? Wasn't that the understanding at the time you made your contract at the very beginning?
"*A.* Yes."

While the court below thought testimony of this nature objectionable, because it was a substitution of an understanding for the written contract, we think it important as illustrating the meaning of the contract, and in no way contradicting it. It explains the manner in which

defendant became the owner of the pianos. This is shown by the following testimony of the defendant:

"*Q.* Now, after this contract was made, state to the court the method of doing business under it.

"*A.* Mr. Vaughan would either telephone me or come and see me, and state that he had some pianos that he wanted to pay for; and either when he came, or the next day after coming or telephoning, he would bring down a consignment receipt covering these pianos, and I would give him a check for the amount necessary to pay for them."

Also by the following testimony of Mr. Vaughan:

"In the first place, I ordered these pianos from the factory myself. Some time after they arrived I would take the bill of the piano to Mr. Whitcomb, and the consignment receipt for the piano giving him the title, and get his check for the amount of money, with the excess of $15 on each instrument. Then I remitted that money to the manufacturer and took his receipt."

After carefully reading this record, we can say, in speaking generally, that this was the method under which these pianos were bought; that is, defendant advanced the money to pay for particular pianos, took consignment receipts in the form of Exhibit C, above specified; the amount written therein being $15 on each piano more than the amount paid for it. That there was a deviation from this method in the larger transaction in the fall of 1902 is undisputed. At that time Mr. Vaughan had in his store, on consignment, a large number of pianos belonging to the Starr Piano Company. The Starr Piano Company owned also a number of contracts similar to contract Exhibit B, in which Mr. Vaughan had an equity representing his commissions. It was arranged between defendant and Mr. Vaughan that the former should advance the money necessary (between $20,000 and $25,000) to enable Mr. Vaughan to settle up with said Starr Piano Company. This amount was accordingly advanced, the Starr Piano Company settling at a discount on the pianos; and the piano contracts covered by that deal came under the

operation of the written contract; Mr. Vaughan giving defendant consignment receipts therefor as provided in the contract.   In pursuance of this plan and under said written contract, Mr. Vaughan bought and sold a large number of pianos, many more than those involved in this suit.

It appears, however, that the plan above agreed upon was departed from in a few instances.   There were some instances where Mr. Vaughan had himself bought and paid for the pianos before getting defendant's money.   In these cases, however, as in others, Mr. Vaughan, at the time of getting the money or immediately thereafter, gave the usual consignment receipts.   According to complainant's argument, in many instances it is conceded that Mr. Vaughan's payment was made very shortly before he obtained the money from the defendant; and the record tends to show that where Mr. Vaughan paid by checks in some instances they were not paid until he had received the money from defendant, so that in reality defendant's money paid for those pianos.

There is an instance occurring in February, 1904, that is somewhat exceptional.   At that time the wife of defendant was ill, and he had to accompany her South for an indefinite time.   Before going, he arranged with Mr. Vaughan that during his absence the money coming in on his account might be used by Vaughan to purchase pianos. After defendant's return in April, Mr. Vaughan made a report to him that he had, during his absence, collected $2,531.26, and that he had expended of this amount $2,432-.50 in purchasing pianos.   He gave defendant a check for the difference, and also gave him consignment receipts for the pianos which defendant supposed he had bought.   It results that there were a few instances in which Mr. Vaughan did not use the defendant's money in making purchases, and in those instances the defendant accepted the consignment receipts believing that Mr. Vaughan had, in accordance with his agreement, purchased the pianos receipted for with defendant's money.

We will now notice some of the claims made by com-

plainant as to the legal effect of the contract and consignment receipts. Among other things, complainant's counsel contend that under the contract defendant's only interest in a piano was the amount of advancement, with interest, and that Mr. Vaughan had the right at any time, upon repayment to the defendant of the amount of his advancement, with interest, to thus extinguish all of the defendant's interest in the piano. We cannot agree with these propositions. It seems to us clear that under the terms of the agreement the defendant owned those pianos, and that Vaughan was to sell them for him as his agent, and that defendant was entitled to have each piano contract stand until the purchaser paid up, so that he should have interest on his money during that period. In other words, that the defendant owned the contracts, and was not bound to sell them to Vaughan or any one else. It is a familiar principle that an agent to sell may not sell to himself. By the agreement, the defendant agreed to "consign for sale," and Vaughan agreed "to accept on consignment for sale, pianos, organs and other musical goods at the price and on the terms and conditions hereinafter agreed upon." "To consign," in mercantile terms, is, ordinarily, to send or transfer goods to a merchant or factor for sale, and the consignee is consequently the person to whom they are consigned, shipped, or otherwise transmitted, and the term implies an agency. The very term "consignment" means title in the consignor. *Dittmar* v. *Norman*, 118 Mass. 324; 6 Am. & Eng. Enc. Law (2d Ed.), p. 798. This indicates, to our mind, that the defendant was to be the owner of the instruments, and that Mr. Vaughan was to deal therewith as defendant's agent. And this appears by other portions of the same contract. By the second paragraph of the contract, Vaughan is required to report all sales promptly, and settle for cash sale immediately. By the fourth paragraph, all contracts and lien notes accepted in settlement of sales were to be indorsed by Vaughan to the defendant, until the amount due for the instrument it represented was set-

tled for in full, with interest as provided.   The fifth para-
graph provides that Vaughan's recompense or commission
should be the amount for which said instrument was sold
in excess of the cost of said instrument, as represented by
a consignment receipt given by Vaughan to defendant,
which receipt formed a part of the contract.   By the
eighth paragraph Vaughan agreed to make all collections
free of expense to defendant, and to report the same,
whenever requested so to do.   By the ninth paragraph,
Vaughan agreed to make report of all stock on hand, or
in prospective customers' hands, whenever requested to do
so.   It seems to us that none of these provisions can be
given force or effect, unless defendant is held to be the
owner, and Vaughan to be acting as a mere agent to sell.

    Complainant's counsel also contend that the defendant,
although claiming to be the owner, had no power to
extinguish Vaughan's interest in the piano, for the latter
might retain possession thereof, and have the right to sell
the piano for any price he deemed fit, and Mr. Vaughan's
so-called "commissions" were not measured as commis-
sions always are, by a percentage upon the purchase
price, but his commissions were all he could get for the
piano over and above the defendant's advancement, with
interest.   We think it already appears that Vaughan was
not at liberty to sell for any price less than that specified
in the consignment receipt.   And counsel's statement that
defendant had not power to extinguish Mr. Vaughan's
interest in the piano we cannot accept, in view of the elev-
enth paragraph of the contract, which provides that:

    "Party of the second part agrees to surrender to the
party of the first part or his authorized agent, on thirty
days' notice, all unsold instruments, held on consignment
under the terms of this agreement, and to deliver same to
any address he may designate in the city of Detroit free
of expense to the party of the first part."

    In other words, defendant, on 30 days' notice, might at
any time absolutely terminate Vaughan's possession of,

and claims in, every unsold instrument in Vaughan's possession.

Neither can we accede to the proposition that commissions are always or usually on a percentage basis. Under the title, "Factors or Commission Merchants" (12 Am. & Eng. Enc. Law [2d Ed.], p. 669), appears the following:

"Amount of compensation. *In the absence of a special agreement*, a factor is entitled, upon the performance of his services, to the usual and customary commissions upon the amount of the goods sold.

It is true that in all his dealings as agent of various piano manufacturers, Mr. Vaughan received all he could get over and above the amount stated in the consignment, or bill, as the purchase price. Moreover, it appeared in the evidence of various experts called upon this subject that this was the customary compensation or commission of piano agents everywhere.

We do not consider it significant, as tending to favor complainant's position, that all sales were made in the name of Mr. Vaughan, or that in the sale the defendant was not treated as the owner of the piano. We understand it is usual and customary for commission merchants to sell in their own names. 12 Am. & Eng. Enc. Law (2d Ed.), p. 633, and authorities cited. In *Slack* v. *Tucker & Co.*, 23 Wall. (U. S.) 321, Bradley, J., speaking for the court, said:

" The difference between a factor or commission merchant and a broker is stated by all the books to be this: 'A factor may buy and sell in his own name, and he has the goods in his possession.' "

Again, it is contended by complainant's solicitors that the fact that Vaughan agreed to pay interest shows that the transaction was a mortgage, and counsel say:

"The obligation to pay interest distinctly stamps the advancement as a debt from Mr. Vaughan to the defendant, because if the defendant was buying the piano from Mr. Vaughan, and the advancement was the purchase

price, Mr. Vaughan would not be paying interest on the advancement. No one pays interest, except upon a debt or obligation he owes."

In *Starr Piano Co.* v. *Morrison*, 159 Mich. 583 (124 N. W. 562), under an agreement very similar in its terms to the one we are considering, provision was made for the payment of interest, and yet that instrument was held not to be a chattel mortgage. Interest may include recompense for the use of anything that has an ascertained pecuniary value, as well as money. We think it may be gathered from the following authorities in this State that Vaughan's agreement to pay interest is not sufficient to make the transaction a chattel mortgage. *Ryan* v. *Wayson*, 108 Mich. 519 (66 N. W. 370); *Stack* v. *Olmsted*, 127 Mich. 359 (86 N. W. 851); *Bunday* v. *Machine Co.*, 143 Mich. 10 (106 N. W. 397, 5 L. R. A. [N. S.] 475); *A'Hern* v. *Lipsett*, 154 Mich. 196 (117 N. W. 577). In every one of these cases, interest was required to be paid to the seller, but it was nevertheless held that the title did not pass.

Complainant further contends that under the seventh and twelfth paragraphs of the contract Vaughan was bound to make good to defendant any deficiency that might result in the repayment to defendant of the amount of his advancement, with interest, in case the sale of the piano resulted in such deficiency. An examination of these paragraphs will show that they apply exclusively to cases where the first purchaser of the piano failed to keep up his payments, and Vaughan found it necessary to repossess the instrument, and we do not think the statement of counsel is justified. But, if Vaughan had made himself liable for the purchase price of the instrument, upon the mere contingency of the purchaser failing to make his payments according to contract, this circumstance would by no means have been inconsistent with defendant's ownership of the instrument, and Vaughan's agency in dealing therewith. It would have been a mere instance

of the ordinary *del credere* agency. In 9 Am. & Eng. Enc. Law (2d Ed.), p. 182, appears the following:

"The term '*del credere*' is applied to a contract whereby an agent or factor, in consideration of an increased commission, absolutely engages to pay to his principal the price of goods sold by him, when the term of credit given to purchasers has expired, thus relieving the principal of all risk of loss on such sales in case the purchasers fail to pay."

Neither do we consider the fact that Vaughan was required to carry insurance upon the pianos as of any significance. This is one of the ordinary duties of the factor or commission merchant. 12 Am. & Eng. Enc. Law (2d Ed.), pp. 656, 657. Taken as a whole, in our opinion, the meaning of Exhibit B is in no way doubtful. It shows that the title to the pianos was vested in the defendant, and in him only. There is not even a semblance of a defeasance clause in the instrument. The circumstances under which the agreement was made, the fact that a form was used, which is similar to that which had been used by the Starr Piano Company, is significant as tending to show, not only how business of this nature had been carried on, but how it was intended to be carried on in this instance. We have already referred to the case of *Starr Piano Co.* v. *Morrison, supra.*

There is much evidence in the record, consisting of oral testimony, which gives a practical construction to Exhibit B, as shown in the numerous dealings between the parties; and considering Exhibits B and C together, and the fact that there is no defeasance clause found within the four corners of either of the instruments, we may well look into the testimony of the parties who made the instruments to determine what construction they gave them. In the testimony of the witness Vaughan appears the following:

"*Q.* That instrument states that Mr. Whitcomb is to be the owner of the pianos substantially, and that you are to sell them on commission; what is the fact as to whether

that was a true representation of your relations, as you then understood them?

"*A.* Yes, sir. *   *   *

"*Q.* I want to get the run of this business. What was your course when Mr. Whitcomb paid for the piano? The stipulation says that you charged him with the price of the piano, and credited him with the money paid, on your book; was that the way you carried on that business?

"*A.* Yes, sir.

"*Q.* Was this course followed in reference to all the pianos with which you dealt, under the consignment receipt arrangement?

"*A.* Yes, sir.

"*Q.* Now, I will ask you what was the understanding between the parties—what was your understanding as to whether Mr. Whitcomb bought these pianos, and paid the money to pay for them, or whether he loaned you money and took security on the pianos?   *   *   *

"*A.* In the first place, I ordered those pianos from the factory myself. Some time after they arrived, I would take the bill of the piano to Mr. Whitcomb, and the consignment receipt for the piano, giving him the title, and get his check for the amount of money, with the excess of $15 on each instrument. Then I remitted the money to the manufacturer, and took his receipt. After I got the—

"*Mr. Graves:* The receipts ran to you?

"*A.* Yes; in most cases. When I received those receipts I would hand them to Mr. Whitcomb.   *   *   *

"*Q.* Here is a question I want to put to you: Was it the purpose, in giving that consignment receipt and taking the pay for the piano, to make him the owner of the piano, or were you giving him security?   *   *   *

"*A.* I intended to sell him the piano.

"*Q.* Afterwards, in dealing with this piano, did you have any interest in it, except your commission—the commission measured by the difference between the amount mentioned in the consignment receipt, and the amount that you sold the piano for and collected?   *   *   *

"*A.* No.

"*Q.* In selling a piano, what is the fact as to whether you understood that you were acting on your own account, or acting as agent, in the same way you acted, for instance, for the Starr Piano Company on their consigned pianos?   *   *   *

"*A.* I considered it the same kind of a deal, and acted in the same way.

"*Q.* In what way was that?

"*A.* To sell the piano, and take the profit over and above the cost.    *    *    *"

We have already quoted somewhat from the testimony of the defendant. Without repeating what we have already quoted, we insert the following, taken from his testimony:

"*Q.* At whose suggestion was this contract of June 24, 1902, entered into; who first brought the matter up?

"*A.* Do you mean the making of the contract, or the proposing?

"*Q.* Yes.

"*A.* Mr. Vaughan suggested the idea of my purchasing pianos." (This follows the language which we have already quoted.)

Witness continues:

"The arrangement between Mr. Vaughan and myself came about in this way: I had a considerable sum of money coming into my hands at that time from the sale of some Edison Electric Light stock, and Mr. Vaughan knew about it. It seemed to be mutually desirable to extend the arrangement, and for that reason Mr. Vaughan saw the Starr Piano people. About the Starr Piano Company and its contracts, Mr. Vaughan told me he had a very large number of contracts in their hands in which he had equities, and also that the entire stock on his floor was consigned to him by the Starr Piano Company. He told me he thought he could get a lower price by settling up all those matters, and could make it worth my while to take the place of the Starr Piano Company in those various transactions. I did not see any of the officers of the Starr Piano Company in connection with that deal at that time. I know that Mr. Vaughan went to Richmond, Ind., to see them about it. He reported to me that the Starr Piano Company had offered him a substantial reduction for the settlement of his entire account with them, and he made me proposals to take it over."

There is nothing in this record, which we have been able to discover, that throws any doubt upon the truth-

fulness of the testimony of the witness above quoted.   In
such a case as this, we think it competent, under our
numerous decisions, where it is sought to show that the
instrument, apparently a consignment contract, or bill of.
sale, is really a chattel mortgage, to consider the circum-
stances under which the instrument was made, as well as
the practical construction given to it by the parties in their
dealings under the instrument.   *Cornell* v. *Hall,* 22
Mich. 377; *Sowles* v. *Wilcox,* 127 Mich. 166 (86 N. W.
689); *Carveth* v. *Winegar,* 133 Mich. 34 (94 N. W. 381).

From the stipulation of facts, we extract the following :

"Vaughan kept a book called the 'Piano Register,' in
which he entered under the name of the manufacturer,
the name and number of each piano purchased, with the
cost price.   In this book he entered in red ink the letter
'W' before the number of each piano in which Whit-
comb was interested.   Vaughan kept an account with
Whitcomb in his ledger, styled 'E. B. Whitcomb Stock
Account.'   In this account he charged Whitcomb with
each particular piano, by number and price, in which
Whitcomb was interested, and credited Whitcomb with
all money received from Whitcomb.   Vaughan also
kept an account, styled 'E. B. Whitcomb Contract,'
in which he credited Whitcomb with all moneys collected
on contracts in which Whitcomb was interested, and
charged him with all moneys paid to Whitcomb from
such collections.   These two accounts include all pianos
and piano contracts involved in this suit.

"Vaughan kept a book, styled a 'Journal,' that related
solely to pianos and piano contracts in which Whitcomb
was interested.   In this book are entered all the pianos
and piano contracts involved in this suit, with the date
when Whitcomb became interested in the pianos, the
date of each contract, and the name of the purchaser.
He also kept another book, styled a 'Ledger,' in which
were entered all contracts relating to each and every in-
strument in which Whitcomb was interested, with an
account in detail of the payments and interest charges,
and amounts due from time to time as to each contract.
The accuracy of Vaughan's books is not conceded for pur-
poses in this case by either party.    *    *    *"

It is significant that thus, by the contract of the parties

and by their conduct, it may be said that the intention of the parties was to vest in the defendant the title to the pianos in question in this case. Through all the dealings between these parties, it would seem that their manner of bookkeeping was inconsistent with any hypothesis, except that defendant owned the instruments, and that Vaughan was merely his agent in dealing with them. Through all the dealings, their practice was for Vaughan to report these collections substantially once a week, and corresponding entries were then made by the defendant in his books. Frequent statements were made between the parties, always upon the basis that defendant owned the pianos and piano contracts, and that Vaughan had nothing in them except his commissions.

A further extract from the testimony of defendant explains the manner of settlement:

"I had settlements from time to time with him. In practice between Mr. Vaughan and myself, the first money collected on the consigned pianos he got. He got the money until his commissions were all received.

"Q. We will suppose here are a dozen, more or less, contracts, in which he had substantially collected his commission, some a little more and some a little less; how was that matter settled up between you?

"A. He rendered me a statement of the contracts and the amount due on each, with the interest computed to date, and made a statement of the purchase price of the pianos, including the $15 and the interest upon the purchase price from the time the contract was made with the other parties—the time the property was sold on contract to the purchaser." (This is illustrated by certain exhibits offered in evidence.) Witness continues:

"They were made and brought to me by Mr. Vaughan about the time they bear date. As I find the transaction on my books, I credited the account with the consigned pianos, and charged Mr. Vaughan with the same amount. On each contract I think I always had the usual paper assigning them to me, guaranteeing the value of the contract at the time; and that was attached to the contract and delivered to me. I had possession of the contracts from that time forward. Mr. Vaughan made the collections from the purchasers."

In other words, as soon as Mr. Vaughan had received his commissions upon the piano contracts, his interest therein ceased, and the same were turned over absolutely to defendant. Certainly this manner of dealing was not the one that would have been pursued, had this instrument been intended to be a chattel mortgage to secure loans. The dealings of the parties show that, as between them, defendant was understood to be the owner exactly as he is stated to be, both in the contract of June 24, 1902, and the consignment. The foregoing course of dealing, including the book entries and the contract existing between the parties, is amply sufficient to vest the title of the pianos and piano contracts in defendant. *Leo Austrian & Co.* v. *Springer*, 94 Mich. 343 (54 N. W. 50, 34 Am. St. Rep. 350).

In the face of this practical construction, carried into effect by the parties themselves, in scores of instances covering the whole period of their dealings, which dealings were in entire harmony with the written agreements between them, we do not see any reasonable theory upon which we should place a construction upon them directly antagonistic to their terms. Further than this, we think that the contract (Exhibit B) and the consignment receipts lack the essentials of a chattel mortgage. In Jones on Chattel Mortgages, § 32, the author says:

"A vendor who alleges that his absolute bill of sale was intended only as a mortgage must make strict proof of the fact. Having given the transaction this form, he should be bound according to its terms, until he shows by evidence, clear and convincing, that both parties to it really intended it should have a different effect, and that it does not express their real contract."

In 20 Am. & Eng. Enc. Law (2d Ed.), pp. 898, 899, we quote the following:

" The essential characteristics of a mortgage are that there is a debt, legal liability, or obligation actually existing at the time of its execution, or contemplated at such time and afterwards actually incurred, and intention to

167 MICH.—6.

secure that debt or obligation by some form of conveyance and agreement."

See *Snook* v. *Davis*, 6 Mich. 156. The above case in some of its facts is very similar to the case at bar. *Starr Piano Co.* v. *Morrison, supra*. And as to the proof required to show that an absolute transfer is a mortgage, see *Johnson* v. *Van Velsor*, 43 Mich. 208 (5 N. W. 265); *Tilden* v. *Streeter*, 45 Mich. 533 (8 N. W. 502); *Rathbone* v. *Maltz*, 155 Mich. 306 (118 N. W. 991).

We do not doubt the doctrine that a defeasance may be proved by parol evidence, although the instrument purports to be an absolute transfer, and counsel for complainant cite cases in support of this doctrine. But in this case we have been unable to find any evidence, either oral or written, that even tends to establish such defeasance. Every witness who had a knowledge of the intention of the parties has sworn that an absolute title passed, and such, we think, is the fair legal effect of every document produced.

We have examined with care the numerous cases cited by complainant, and think that they can be easily distinguished from the instant case. In the cases cited the evidence clearly showed that there was an indebtedness, and that the instrument in question was intended as security for the indebtedness. This element is entirely wanting in the case we are considering. In the face of the written agreement between the parties, by which the title to each piano or piano contract was vested in defendant, in spite of their conduct, showing a practical construction inconsistent with any other theory, and opposed to their positive testimony, we are asked to hold that Mr. Vaughan was at all times the owner of these instruments and piano contracts, and that defendant was a mere mortgagee. We must decline to so hold. The defendant has paid in cash the purchase price of every instrument involved in this controversy. Out of his moneys the manufacturers have received their compensation for making the instru-

ments. As to most of the pianos in question, Vaughan was never the owner as between him and defendant.

In the few instances where the contracts had been made before the dealings with the defendant, this was not true; but why should a different rule be applied to those contracts? These pianos were then in the hands of purchasers, who might make default. We see no reason why they might not come under the operation of this contract, and be legally treated as they were, in fact, treated by the parties. The defendant by such transaction clearly acquired the title which Mr. Vaughan and himself intended he should acquire. In our opinion, the title was intended to be that of an owner, and not that of a mortgagee.

If it be competent, and it certainly is, for a dealer like Mr. Vaughan to make the written contract made in this case with the original manufacturer of the pianos, what ground is there for contending that an investor like defendant may not stand in the shoes of the manufacturer? Had defendant dealt directly with the manufacturer, and had the goods consigned to himself, instead of to Mr. Vaughan, no one would have questioned the transaction. Had the manufacturer been informed of the arrangement between defendant and Mr. Vaughan, no one would have questioned it. The ignorance of the manufacturer who gets his cash for the goods is utterly immaterial under the circumstances, for he is in no way prejudiced by the secret arrangement between Mr. Vaughan and defendant. As to every one else, except the manufacturer—the general creditors of Mr. Vaughan and the other dealers of whom he purchased—the transaction is in all respects the same as if Mr. Vaughan held the pianos on consignment from the manufacturer. We see no reason why this same rule should not apply to the exceptional instances in this case. In some of those instances, it will be remembered that defendant accepted the consignment receipts, believing that the pianos receipted for were new pianos purchased with his money. We think that those transactions are controlled by the same rule of law that controls the

others. The deception practiced upon defendant by Mr. Vaughan should not lessen defendant's rights. The mere fact that the title was in Mr. Vaughan was, as we have above said, immaterial. Most certainly Mr. Vaughan might have sold to defendant a particular piano, or any number of pianos at that time owned by him (Vaughan), and arranged that he should sell them as defendant's agent. Of course, there is in such a case, by reason of section 9520, 3 Comp. Laws, a presumption of bad faith, because there is no change of possession; but that section has no application here, and its application is not invoked by complainant. Complainant does not seem to question, and we think the evidence establishes, defendant's good faith. We conclude, therefore, that the complainant in this case has no such interest in the property as to enable him to contend that defendant's only title to the property in question arises from an unrecorded chattel mortgage. In our opinion, defendant's title was that of ownership, and not of mortgagee.

2. There is no doubt that some of the contracts in this suit are greater in value than the purchase price of the pianos; but in this we do not think the complainant can gain any advantage. This claim might be asserted if the written contract had been performed as between the parties, but it was not performed. The written contract obligated Mr. Vaughan to pay the purchase price to defendant, and the interest thereon, out of the first moneys collected on the contract. Had this plan been carried out, it would have followed that, after defendant received his pay, Mr. Vaughan would have had an equity in the contract, but that plan was not carried out. By the consent of defendant, Mr. Vaughan used the first money paid on the piano contracts to reimburse himself. More than that, he went beyond this and appropriated to his own use upwards of $7,000 of the money belonging to defendant. It would be most inequitable to deny the defendant the right to pay the commissions not collected by Mr. Vaughan by crediting them against this overdraft; and, unless forbid-

den to do so by some rule of law, a court of equity should permit this to be done.

So far as this claim is concerned, the complainant stands in the attitude of seeking an accounting under the contract, as the claim rests upon the contract. He claims that under that contract certain commissions were due to Mr. Vaughan for which defendant must account. It seems to us too clear for argument that in determining that account a court of equity will consider Mr. Vaughan's obligations to the defendant, arising from the same contract. Let it be granted that under the contract defendant owed Mr. Vaughan several hundred dollars for commissions; it is clear that under the same contract Mr. Vaughan owed defendant several thousand dollars, growing out of collections for which he did not account. Had Mr. Vaughan brought this suit before he became a bankrupt, and before he turned over or assigned the contracts to defendant, is it not clear that in an accounting he would have been compelled to give defendant credit for the $7,698.03 which he had misappropriated ? Would the court in that case have given Mr. Vaughan a decree for the amount of his commissions, and given defendant a decree for the money misappropriated, and have permitted Mr. Vaughan to enforce his decree without compelling him to satisfy defendant's decree ? We think not. But one decree would have been made, and that a decree in defendant's favor for the balance his due.

The fact that Mr. Vaughan became a bankrupt, and that the suit is commenced and prosecuted by his trustee, rather than by himself, is, in this regard, we think, entirely immaterial. The trustee has no other or greater rights than Mr. Vaughan had when he became a bankrupt. He succeeded to Mr. Vaughan's rights; he did not acquire additional rights; and, as defendant had a right as against Mr Vaughan to credit the amount due him (Vaughan) for commissions against the amount owing by him on the contract, we think he has that right yet, and

may assert it in this suit. This view of the case renders it unnecessary to consider the other questions presented.

The decree of the circuit court is affirmed, with costs.

OSTRANDER, C. J., and BIRD and MOORE, JJ., concurred with STONE, J. BLAIR, J., concurred in the result.